SIXTH DIVISION
December 11, 2009

Nos. 1-07-3566, 1-08-0702, 1-08-0746, 1-08-1373, 1-08-1982, 1-08-1983, 1-08-2151, and 1-08-2152 (Cons.)

| | |
|---|---|
| JOSEPH M. GAMBINO, Independent Administrator of the Estate of Joseph J. Gambino, and NORTH STAR TRUST COMPANY, as Trustee u/t/a Nos. 13534, 23985, 23994,<br><br>        Plaintiffs-Appellees, Cross-Appellants<br>        and Counter-Defendants,<br><br>   v.<br><br>BOULEVARD MORTGAGE CORPORATION, TITLE AMERICA, INC., W.W. FUNDING, L.L.C., DENNIS D. KOONCE and STEPHEN WOLF,<br><br>        Defendants and<br>        Counterplaintiffs-Appellants<br><br>(Washington Mutual Bank, a Federal Association, and Plaza Bank,<br><br>        Defendants-Appellants and<br>        Cross-Appellees,<br><br>and Salvatore DiBenedetto, and Vincenzo DiBenedetto,<br><br>        Defendants-Appellants). | Appeal from the Circuit Court of Cook County.<br><br><br><br><br><br><br><br><br><br><br>No. 05 CH 4303<br><br><br><br><br><br><br><br><br><br><br>Honorable<br>Nancy J. Arnold,<br>Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

These consolidated appeals arise from an action to quiet title to three parcels of real estate and to recover damages for slander of title filed in the chancery division of the circuit court of Cook County. Joseph J. Gambino (Gambino), as beneficiary of three

separate land trusts, and North Star Trust Company (North Star), as trustee under land trust agreements Nos. 13534, 23985, and 23994, filed this action to quiet title to the three parcels of real estate and to recover damages for slander of title against certain defendants. The subject properties are located at 7460 North Milwaukee Avenue in Niles, Illinois (Niles Property), 2738-40 North Kedzie Avenue in Chicago (Kedzie Property), and 3619 North Lavergne Avenue in Chicago (Lavergne Property).[1] Gambino suffered a heart attack during his discovery deposition in this matter and died shortly thereafter. Joseph M. Gambino was substituted as party plaintiff as independent administrator of his father's estate.

After a two-week bench trial in late October and early November of 2007, the trial court found in favor of plaintiffs on all counts of their complaint declaring (1) title to the subject properties was vested in North Star under trust agreements Nos. 13534, 23985, and 23994, and (2) all purported inconsistent instruments of title and any clouds on title to the subject properties, including mortgage liens, were void. Further, the trial court awarded plaintiffs compensatory damages of $595,574 and (2) punitive damages of $675,000 as follows: $500,000, jointly and severally, against defendants Salvatore DiBenedetto, Vincenzo DiBenedetto, Dennis Koonce, Boulevard Mortgage Corporation, and Title America, Inc., and $175,000, jointly and severally, against defendants Stephen Wolf and W.W. Funding, L.L.C. We affirm.

---

[1] The properties will be referred to collectively as the "subject properties" where appropriate.

BACKGROUND

1.  The Pleadings

Plaintiffs' verified "Corrected Second Amended Complaint" contained six counts, two counts as to each of the three subject properties. As to each of the properties, one count sought to quiet title and a second count alleged slander of title. The allegations of the complaint common to all six counts were as follows.[2] Gambino, 73 years old at the time of his death in 2006, owned and operated the United Transmission Center (United), an Illinois corporation, a motor vehicle transmission repair business located at the Niles Property. The Lavergne Property consisted of a four-unit, multifamily apartment building that Gambino owned for "investment purposes." In October 2002, Gambino met with his nephew, defendant Salvatore DiBenedetto (Sal), whom Gambino believed to be a mortgage broker, to assist him in refinancing one or more of his properties in order to pay off certain financial obligations. Over the following two months, Gambino and Sal had several discussions, during which Sal obtained information concerning Gambino's business and assets, including information regarding the subject properties.

The complaint alleged that Sal represented to Gambino that he and several real estate investors were interested in purchasing the Niles and Kedzie Properties and the transmission business. Sal suggested that the transmission business should be managed by his brother, defendant Enzo DiBenedetto (Enzo). Gambino refused. Shortly

[2] Previous versions of plaintiffs' complaint were verified by the sworn affidavit of Gambino, prior to his death and preserved in plaintiffs' "Corrected Second Amended Complaint," which contained binding judicial admissions. *Winnetka Bank v. Mandas,* 202 Ill. App. 3d 373, 396 (1990).

3

thereafter in 2003, Sal offered to purchase the Lavergne Property in a written purchase agreement with an offer of $550,000. Gambino never accepted the offer.

The complaint further alleged that Sal personally loaned Gambino $70,000 to be repaid upon future refinancing or sale of any of the subject properties. The complaint alleged that Sal requested permission to remove underground liquid storage tanks at the Niles Property prior to any transfer of the property, and Gambino refused.

The complaint further alleged that Gambino never: (1) signed any agreement regarding the conveyance of any of the subject properties, or the purchase of United; (2) authorized Sal or anyone else to place liens or encumbrances upon any of the subject properties, including any mortgages; (3) authorized anyone to affix his signature to any document concerning any of the subject properties; or (4) directed his land trustee North Star to transfer title or his beneficial interest in the subject properties to anyone.

The complaint further alleged that Sal, Enzo, Boulevard, and defendants Dennis Koonce and Title America, Inc. (Title America), "participated in" forging deeds, and other documents, to "procure and secure" mortgages on those properties. The complaint alleged that Koonce, an attorney, participated in each of the transactions that purported to convey title to the subject properties. Additionally, the complaint alleged that Boulevard and Title America are both owned and controlled by Koonce, that Boulevard was the ultimate grantee in a series of forged deeds pertaining to the Lavergne Property, and that Title America acted as title agent with regard to all but one of the transactions that purported to convey title to the subject properties.

Count I of plaintiffs' complaint, pled against Sal, Enzo, Koonce, Boulevard, Title America, and Washington Mutual Bank, sought to quiet title to the Lavergne Property.

4

Count I of plaintiff's complaint alleged that in May 2003, a mortgage lien in favor of LaSalle Bank existed on the Lavergne Property, with a principal balance of approximately $200,000. On May 5, 2003, LaSalle "informed" Gambino that the mortgage had been paid in full although Gambino was unaware of this transaction.

Count I further alleged that unbeknownst to plaintiffs, Sal, Enzo, Koonce, Boulevard, and Title America recorded against the Lavergne Property: a forged trustee's deed purportedly executed by North Star, conveying title to the Lavergne Property to Koonce; a mortgage naming Koonce as the borrower and Equity Plus, Inc., as the lender, with a principal sum of $400,000; a mortgage naming Koonce as the borrower and Washington Mutual as the lender with a principal sum of $406,000; and a quitclaim deed, listing Koonce as the grantor and Boulevard as the grantee. Count I further alleges that Sal, Enzo, Koonce, Boulevard, Title America and Washington Mutual knew or should have known that the purported trustee's deed conveying title to Koonce was forged.

Count II of plaintiffs' complaint, pled against Sal, Enzo, Koonce, Boulevard, and Title America, seeking compensatory and punitive damages, alleges slander of title with regard to the Lavergne Property.

Count III of plaintiffs' complaint, pled against Sal, Enzo, Koonce, Title America, W.W. Funding, L.L.C. (WW Funding), Stephen Wolf, and Plaza Bank, sought to quiet title to the Niles Property. Count III alleged that in the early fall of 2003, Reuben Zippershtein told Gambino that he was the mortgagee to the Niles Property and that the mortgage was in default. On January 21, 2004, Zippershtein filed suit to foreclose the mortgage. On July 9, 2004, Zippershtein voluntarily dismissed the foreclosure suit and executed a release deed of the recorded mortgage on the Niles Property.

5

Count III alleged that the Zippershtein mortgage was a result of forged and unauthorized instruments which were recorded by Sal, Enzo, Koonce, Boulevard, Title America, Wolf and WW Funding. Count III further alleged that the following illegal instruments were recorded against the Niles Property: a forged trustee's deed, purportedly executed by North Star, conveying title to the Niles Property to "Joseph J. Gambino"; a mortgage naming "Joseph J. Gambino" as the borrower and Zippershtein as the lender, with a principal sum of $200,000; a warrantee deed, listing "Joseph J. Gambino" as the grantor and WW Funding as the grantee; a mortgage, naming WW Funding as the borrower and defendant Plaza Bank as the lender, with a principal sum of $445,000; and an assignment, purporting to assign rents from WW Funding to Plaza Bank. Count III further alleged that Sal, Enzo, Koonce, Boulevard, Title America, WW Funding, Wolf, and Plaza Bank knew or should have known that the purported trustee's deed conveying title to "Joseph J. Gambino" was forged.

Count IV of plaintiffs' complaint, pled against Sal, Enzo, Koonce, Boulevard, Title America, WW Funding, and Wolf, seeking compensatory and punitive damages, alleged slander of title with regard to the Niles Property.

Count V of plaintiffs' complaint, pled against Sal, Enzo, Koonce, Boulevard, Title America, WW Funding, Wolf, and Plaza Bank, sought to quiet title to the Kedzie Property. Count V alleged that the following illegal instruments were recorded against the Kedzie Property: a forged trustee's deed, purportedly executed by North Star, conveying title to the Kedzie Property to "Joseph J. Gambino"; a forged warrantee deed, listing "Joseph J. Gambino" as the grantor and 21st Century Financial Planners, Inc.

6

(Century), as the grantee[3]; a special warranty deed, listing Century as grantor and WW Funding as grantee; a mortgage naming WW Funding as the borrower and Plaza Bank as the lender, with a principal sum of $350,000; and an assignment, purporting to assign rents from WW Funding to Plaza Bank. Count V further alleged that Sal, Enzo, Koonce, Boulevard, Title America, WW Funding, Wolf, and Plaza Bank knew or should have known that the purported trustee's deed conveying title to "Joseph J. Gambino" was forged.

Count VI of plaintiffs' complaint, pled against Sal, Enzo, Koonce, Boulevard, Title America, WW Funding, and Wolf, seeking compensatory and punitive damages, alleged slander of title with regard to the Kedzie Property.

As noted, defendants Koonce, Boulevard, Title America, and WW Funding filed counterclaims which included claims to quiet title to the subject properties. The Koonce defendants' (Koonce, Boulevard, and Title America) verified amended counterclaim contained five counts. Count I of the Koonce-related defendants' counterclaim sought a judgment to quiet title to the Lavergne Property in favor of Boulevard. Counts II, III, IV, and V of the Koonce defendants' counterclaim alleged unjust enrichment, fraud, intentional interference with a business relationship, and slander of title, respectively.

Further, the Koonce defendants raised affirmative defenses to plaintiffs' complaint consisting of waiver, estoppel, ratification, and *laches*.

---

[3] This warranty deed bears an execution date of January 17, 2003; the complaint alleges that on that same date, Gambino's signature was forged to a commercial lease where Gambino purportedly leased the Kedzie Property from Century. This lease was signed by Wolf on behalf of Century.

WW Funding's counterclaim was filed in two counts. One count concerned the Kedzie Property and the other count concerned the Niles Property. In each count WW Funding sought to quiet title or, in the alternative, to obtain reimbursement from Gambino's estate for various sums.[4]

2. Overview of the Events Leading to Trial

As noted, this case was tried as a bench trial over a two-week period in late October and early November of 2007. In order to provide context for the testimony presented in this case, we will provide an overview of the events leading to trial, including a description of the real estate closings, the disbursement of funds, and the parties' involvement in those closings.

It is undisputed by the parties that Gambino was in serious financial debt in the summer of 2002, owing overdue payroll and real estate taxes. United, Gambino's motor vehicle transmission repair business, had failed to pay payroll taxes since 1999 and owed the Internal Revenue Service (IRS) approximately $125,000 to $150,000 for back taxes, penalties, and interest. Gambino was in danger of losing properties, which had been sold to tax buyers for unpaid real estate taxes that were past due.

By June 2002, the payroll taxes had gone unpaid for years, and the IRS threatened to levy on United and close them down, seize its assets, and/or personally assess

_____

[4] At oral argument before this court on November 12, 2009, counsel for Wolf and WW Funding stated that both Wolf and WW Funding seek only to vacate the trial court's findings against them with respect to slander of title, and that WW Funding no longer seeks a finding of quiet title with respect to either the Kedzie or Niles Property or reimbursement from Gambino's estate.

8

Gambino for the outstanding moneys due. In June 2002, Gambino hired Jeffrey Pritikin, who testified in plaintiffs' case-in-chief. Pritikin testified he was an accountant and an "enrolled agent" licensed to represent taxpayers before the IRS. He testified that one can become an "enrolled agent" by working for the IRS for five years, and he had worked for the IRS for seven years. He is not an attorney and not a certified public accountant.

Pritikin testified that Gambino told him that he intended to borrow money by using the subject properties as security; in September 2002, Gambino approached his nephew Sal, who "had contacts" in the mortgage industry. Pritikin spoke with Sal, who claimed he was able to arrange a loan for Gambino and provided Pritikin with a commitment letter to present to the IRS to "stall" any seizure of Gambino's or United's assets. Pritikin submitted a form to the IRS which contained a description of the subject properties and their corresponding values, which were less than the values of what the subject properties were appraised for.

Six transactions, two as to each of the subject properties, form the basis of plaintiffs' complaint to quiet title and for damages for slander of title. The testimony at trial concerning the transactions, and the circumstances surrounding them, indicate the following. The witnesses whose testimony provides the basis for the following synopsis were called as witnesses in plaintiffs' case-in-chief, and they testified without objection under the Dead-Man's Act (735 ILCS 5/8-201 (West 2006)), as did Pritikin.

Sal sought a collateral-based lender for the Niles Property in the summer of 2002. He met with Wolf and explained what he was looking for. Wolf spoke with his associate, Reuben Zippershtein (since deceased), a "hard money" lender, who made a loan on the property. Sal testified that Zippershtein agreed to loan Gambino $200,000 to be repaid in

9

one year, and that Zippershtein advised Gambino to direct North Star to convey legal title to Gambino because a loan could not be procured if legal title was held in trust.

Maritza Castillo, a senior trust officer for North Star, testified that Gambino executed three written directions to convey legal title to Gambino from the land trusts. He told her that he was going to refinance the properties and required legal title conveyed to him personally.

Koonce testified that in October 2002, at Sal's request, he began to give money to Sal and Enzo for what he believed were loans to Gambino. Koonce testified that he signed numerous checks payable to Sal and Enzo and gave them to Sal frequently over a period of about three years totaling of $157,300.

Sal testified that he arranged for an appraisal of the Niles Property, for which he and Enzo both testified Enzo paid the appraiser $5,000. Gambino accompanied the appraiser through the property during the appraisal. The property was appraised at $550,000, and the appraisal report was delivered to Zippershtein's office. Sal testified that he obtained an estimate of redemption for the past-due real estate taxes owed on the Niles Property and forwarded copies to Zippershtein, Gambino, and Koonce. Real estate taxes had not been paid since 1999 and the property had been sold to a tax buyer.

Stephen Fritzshall, Zippershtein's attorney, testified that Zippershtein telephoned him to drop everything to prepare the legal documents to "save Gambino's business and property." Koonce faxed Fritzshall wire instructions and provided a copy of the title commitment issued by Title America.

The first closing related to the Niles Property occurred on December 20, 2002. Sal testified that he obtained the closing documents from Koonce and Fritzshall, the

10

trustee's deed conveying title to Gambino and other documents from Gambino, "got the transfer tax exemption stamp in Niles, and went to Zippershtein's office for the checks and a conference call with Koonce." Fritzshall, Zippershtein, Sal, and Wolf were present, with Koonce representing the title company and assisting by telephone. Koonce transmitted to Fritzshall an insurance binder and a signed Housing and Urban Development (HUD) settlement statement signed by Koonce and purportedly signed by Gambino.

Koonce testified that he made disbursements on behalf of Title America pursuant to Gambino's purported letter of direction, which was delivered by Sal. Disbursements were made to the following:

| | | |
|---|---|---|
| Stephen Wolf | $5,250 | (commitment fees) |
| Adam Wolf | $4,000 | (commitment fees) |
| Zippershtein | $15,750 | (commitment fees) |
| December Interest | $3,000 | (on Zippershtein mortgage) |
| Fritzshall | $1,500 | (attorney fees) |
| Mortgage Escrow | $33,000 | (11 months of payments on mortgage) |
| Sal | $53,141.91 | (for back taxes) |
| Enzo | $5,000 | (appraisal fee) |
| Lawyers Title | $282 | (title policy, etc.) |
| Koonce, Title America | $1490 | (closing fees) |
| Gambino | $52,586.09 | |
| Sal | $25,000 | (Sal testified that the moneys went to Gambino) |
| | ---------------------------------------------------------- | |
| | $200,000 | Total |

Sal testified that he obtained a cashier's check at Harris Bank for the property taxes and cashed the check payable to him, paid the outstanding real estate taxes, drove to Gambino's office in Niles and gave him copies of the tax paid receipts and of the title company checks, and $25,000 in cash and cashier's checks (Sal could not recall what portion of the $25,000 was in currency or cashier's checks). Sal obtained the deed at

11

Koonce's office on December 26, 2002, and had it recorded at the Cook County recorder of deed's office in Markham, Illinois.

Within a month of the first transaction concerning the Niles Property, Sal contacted investors, including Wolf, as funding sources for a loan on the Kedzie Property. Wolf testified that he was not interested in lending money on the Kedzie Property but that he telephoned an investor David Azran and asked Azran if he wanted to make a loan. Azran agreed to do so through his company, 21st Century Financial (Century). Sal testified that he was introduced to Stephen Richek, Azran's attorney.

Century purportedly loaned Gambino $200,000, through a sale and lease back of the Kedzie Property, which was to include a purchase option to Gambino. Century was to hold title for a year, receive $3,000 per month pursuant to the purported lease, maintain a reserve for interest, taxes, and insurance and funds to cover all the costs of the loan and the fees involved, and, if Gambino did not pay off the loan in a year, keep title.

Richek prepared the legal documentation for the transaction. Marc Smith was also involved as attorney for the Wolfs in the transaction, and prepared some of the documentation. Estimates of redemption for the outstanding Kedzie Property real estate taxes were obtained by Sal.

The closing took place on January 17, 2003. Sal delivered what purported to be a trustee's deed for the Kedzie Property conveying title to Gambino. Sal testified that he picked up closing documents from Koonce and the deed and other documents from Gambino, and delivered them to Richek at Zippershtein's office. He testified that he obtained a $200,000 check from Century at Zippershtien's office and delivered it to

12

Koonce. Azran was not at the closing. The lease purporting to have Gambino's signature was signed by Richek on behalf of the lessor.

The following disbursements were made at the January 17, 2003, closing relating to the Kedzie Property:

| | | |
|---|---|---|
| Century | $9,250 | (January rent ($3,000) & loan fee) |
| Steven Wolf | $6,250 | (commitment fee) |
| Adam Wolf | $6,250 | (loan fee) |
| Harris Bank | $30,274.83 | (back taxes) |
| Marc Smith | $2,500 | (attorney fees) |
| Zippershtein | $6,250 | (commitment fee) |
| Richek | $500 | (attorney fees) |
| Chesterfield Insurance | $3,368 | (insurance) |
| Lawyers Title | $2,134 | |
| Title America | $1,190 | (title insurance) |
| Lease Payment | $3,000 | (February lease payment) |
| Norman Trust Account | $25,000 | (the disbursement sheet notes that this amount was to "pay off investor." At trial, Sal admitted that this amount was used to fund a settlement of a lawsuit against him for fraud) |
| Casale, Woodward & Bulls | $5,372.72 | (attorney fees) |
| Lease Escrow | $30,000 | (10 months of lease payments) |
| Water Certificate Escrow | $8,000 | |
| James Halle | $16,000 | (cash purportedly given to Gambino) |
| Mark Guillermo | $9,660.45 | (cash purportedly given to Gambino) |
| Papiese | $25,000 | (cash purportedly given to Gambino) |
| Gambino | $10,000 | (cash Gambino acknowledged he received) |
| | ------------------------------------------------------- | |
| | $200,000 | Total |

The deed was recorded on January 23, 2003.

In January 2003, after the two aforementioned closings had already occurred, Gambino returned the three North Star trustee's deeds he had obtained in December 2002 to North Star, which cancelled the deeds.

13

The first closing related to the Lavernge Property occurred on April 30, 2003, at Lawyers Title. A mortgage lien in favor of LaSalle Bank existed on the Lavergne Property.

Prior to closing, Koonce applied for and obtained a $400,000 loan from Equity Plus. Equity Plus later assigned its mortgage to Countrywide Mortgage. Sal delivered a trustee's deed to Lawyers Title dated April 28, 2003, purporting to convey legal title on the Lavergne Property from North Star as trustee to Koonce. Koonce transferred the assignment of rents from the leases on the four Lavergne Property apartments on May 1, 2003, to Countrywide.

The following disbursements were made on the refinancing:

| | | |
|---|---|---|
| LaSalle Bank | $219,551.03 | (mortgage loan payoff) |
| Equity Plus | $1,093.11 | (loan fees) |
| Boulevard | $850 | (loan application and processing fees) |
| Lawyers Title | $930 | (closing and underwriting fees) |
| Recording Fees | $114 | |
| Chesterfield Insurance | $3,628 | (insurance premium) |
| Koonce | $32,926.71 | (payment escrow for mortgage payments for one year) |
| SBC Ameritech | $4,470 | (for Gambino's past due account) |
| Equity Plus | $3,337.15 | (loan fees) |
| Countrywide Funding | $3,100 | (loan fees) |
| Harris Bank | $10,000 | (cash purportedly given to Gambino) |
| Enzo | $10,000 | (cash purportedly given to Gambino) |
| Enzo | $110,000 | (wired funds purportedly given to Gambino) |
| | $400,000 | Total |

A second closing concerning the Lavergne Property occurred on December 17, 2003, when Koonce refinanced the property for just over $400,000 from Washington Mutual. Koonce applied for the loan as borrower and quitclaimed title to the Lavergne Property to his mortgage company, Boulevard, on the day of closing.

14

At closing, the balance of the Countrywide loan, $399,896.60, was paid. Overdue real estate taxes, in the amount of $2,487.83, were also paid. Settlement charges, including loan fees, interest, title charges, and recording fees, were paid in the amount of $3,222.05.

A second closing also occurred when the Kedzie Property was refinanced in December 2003. Century had not been paid on its mortgage for the loan it made on the Kedzie Property. In December 2003, Sal met with Wolf and told him that Century was going to take title to the Kedzie Property, and asked if Wolf would provide a loan to prevent its loss. Wolf testified that he met with Sal and Gambino, and that during that meeting Gambino told him that Sal was authorized to act on his behalf with regard to any loan secured by the Kedzie Property. Wolf made the loan through his company, WW Funding.

The transaction was structured so that the Century loan would be repaid and the property would be conveyed to WW Funding as collateral for the loan. WW Funding borrowed $350,000 from Plaza Bank, took title to the property, paid the Century mortgage, and granted an option to purchase the property to Koonce. The option provided that if the loan from Plaza was paid within a year, WW Funding would convey title to Koonce. Sal testified that he received a document prepared by Richek or Marc Smith assigning the purchase option, under the lease of the Kedzie Property from Century to Gambino (as noted, the first transaction involving the Kedzie Property was structured as a "sale/leaseback"), to WW Funding. Sal testified that he obtained Gambino's signature on that document and returned the executed assignment to either Richek or Smith.

The following disbursements were made on this refinancing:

| | | |
|---|---|---|
| Tax Escrow | $1,988.14 | (for payment of future real estate taxes) |
| Plaza Bank | $5,250 | (loan fees) |
| Plaza Bank | $200 | (loan document preparation fees) |
| Flood Certificate | $15 | |
| Tax Service Fee | $50 | |
| Century | $218,008.49 | (mortgage loan payoff) |
| Marc Smith | $42,000 | (escrow for monthly rent payments under agreement granting Koonce purchase option) |
| WW Funding | $33,738.74 | ("cash to borrower") |
| WW Funding | $25,800 | (commitment fee & $800 insurance payment) |
| Lawyers Title | $2,380 | (recording fees, tax transfer stamps) |
| Title America | $2,511.50 | (settlement & title insurance) |
| Cook County Collector | $17,808.13 | (back real estate taxes) |
| Water Certificate | $250 | |
| | --------------------------------------------------------------- | |
| | $350,000 | Total |

A second closing related to the Niles Property for refinancing occurred in June 2004. The December 2002 Zippershtein loan had not been paid. Fritzshall sent a letter to Gambino in December 2003, demanding payment. On January 16, 2004, Gambino sent a letter to Fritzshall, denying the existence of the loan. Zippershtein filed a mortgage foreclosure action and later voluntarily dismissed the case. Link testified that in 2004, Gambino told him that the foreclosure action filed by Zippershtein was being dismissed because "somebody had paid off the loan." An agreed order of dismissal entered in that action stated that the "debt at issue was paid in full."

Koonce testified that Enzo, who had planned on acquiring Gambino's business and the buildings housing the business, desired an option to purchase the business and property. The transaction was structured as a refinance, with WW Funding borrowing $445,000, to pay off the Zippershtein mortgage, and providing Koonce with an option to

16

purchase the property for $230,000. Koonce testified that the option was actually for Gambino's benefit, because Gambino had financial issues and did not have enough credit to structure a deal. Koonce was creditworthy and would be able to secure financing to "save" the property.

An agreement purportedly signed by Gambino allowed WW Funding to acquire title to the Niles Property and grant an option to Koonce to purchase the property for $230,000, the amount necessary to pay off the Zippershtein loan. Sal testified that he obtained Gambino's signature on the agreement, and also had him sign a warranty deed to WW Funding that he had notarized. Sal further testified that Gambino signed a power of attorney authorizing Sal to sign any documents necessary to complete the transaction.

The closing occurred at Attorneys Title. Sal signed documents on behalf of Gambino, including the HUD statement. WW Funding borrowed $445,000 from Plaza Bank, took title to the property, and paid off the Zippershtein mortgage.

The following disbursements were made at closing:

| | | |
|---|---|---|
| Zippershtein | $231,680.08 | (mortgage loan payoff) |
| Pullman Bank | $6,675 | (commitment fee) |
| Plaza Bank | $830 | (closing fees) |
| Plaza Bank | $45,000 | (underground tank removal escrow) |
| Real Estate Capital Corp. | $6,675 | (commitment fee (Adam Wolf's brokerage firm)) |
| County Taxes | $7,535.88 | (real estate taxes) |
| Attorney Title | $2,636.50 | (state & county stamps, title insurance, etc.) |
| Recording Fees | $82 | |
| Courier | $30 | |
| Marc Smith | $7,500 | (attorney fees) |
| Water Certificate | $1,184.16 | |
| Balance to WW Funding | $135,171.38 | |
| | ------------------------------------------------------------ | |
| | $445,000 | Total |

Gambino received nothing.

In July 2004, after the claimed refinancing of the Niles Property, Gambino refused to allow workers to remove the underground tanks. In the fall of 2004, Enzo, Sal, and Gambino met with Gambino's first cousin Thomas Gambino (Thomas), who also is Sal and Enzo's uncle, in an attempt to resolve some of the problems they were having. Thomas testified that at the meeting, Gambino confirmed that he had discussed selling the subject properties with Sal and Enzo, and had agreed to let Sal sell one of his properties, and if that worked out to proceed with the others, and talked with Enzo about purchasing United.

At the meeting, Thomas testified that Gambino said that he wanted his properties back. Sal said he could not make that happen at that time; the deal had to be completed or Gambino would lose everything.

In December 2004, Gambino executed a letter to Enzo and Sal "to stop all activity relating to the pending business transaction involving the businesses and properties." When Enzo was cleaning up the Kedzie Property in February 2005, Gambino called the police and Enzo was charged with criminal trespass. Enzo was found not guilty after a bench trial. In March 2005, Gambino and North Star filed this action.

### 3. Trial

The following testimony was presented at trial.

#### a. Plaintiffs' Witnesses

Gambino's widow, Catherine, was called as a witness at trial. She testified that she was married to Gambino on November 15, 1952, and that the two remained married until Gambino's death in 2006. After serving in the military for approximately 10 years,

18

Gambino started a transmission repair business (United) in the 1960s at the Kedzie Property.

Catherine testified that she was familiar with Gambino's signature. She identified plaintiff's exhibit No. 44, which contained a series of handwriting samples, marked K1 through K36, which she identified as her husband's signature. She then reviewed plaintiff's exhibits Nos. 5 through 43, which consisted of legal documents purportedly signed by Gambino concerning the subject properties. She testified that the signatures contained on the documents were not Gambino's signatures.

On cross-examination, Catherine testified without objection that she was aware that Gambino spoke to Sal and Enzo regarding business matters, but did not know the details of those conversations. She identified her signature as well as Gambino's signature on a mortgage loan commitment dated November 29, 2002, signed by Sal on behalf of Boulevard relating to the procurement of a mortgage on her residence. Catherine testified that Gambino was attempting to obtain loans due to financial difficulties he was experiencing, including back taxes owed to the IRS.

Maritza Castillo testified at trial. She testified that she was employed by North Star as trust officer for six years prior to the trial in this matter. She testified that Gambino was the sole beneficiary of the land trusts held by North Star under trust agreement Nos. 13534, 23985, and 23994, until the time of his death. Castillo identifed three trustee's deeds purportedly executed by her and Phyllis Robinson, vice president of North Star. She testified that the signatures bearing her name and Robinson's were not genuine, and that the trustee's deeds were not authentic. She also identified a trust agreement purportedly signed by her as trust officer, dated April 9, 1962, pertaining to

19

the Lavergne Property, which showed Koonce as the sole beneficiary of the land trust. She testified that the land trust agreement was not authentic and that the signature on the trust agreement bearing her name was not genuine.

On cross-examination, Castillo identified three canceled trustee's deeds executed at Gambino's direction in December 2002 regarding the subject properties. Prior to their cancellation, the trustee's deeds conveyed legal title from North Star to Gambino. Castillo testified without objection that Gambino directed North Star to convey him legal title because he planned to refinance the subject properties, but he returned the documents to North Star a few weeks later and directed North Star to cancel them. On further cross-examination, Castillo testified that there was no way that one could determine that the trustee's deeds from North Star were forged by simply viewing the deeds.

Phyllis Robinson also testified at trial. She was retired at the time of trial, but previously was vice president of North Star. Her testimony echoed that of Castillo; she identifed three trustee's deeds purportedly executed by her and Castillo. She testified that the signatures bearing her name and Castillo's name were not genuine.

Pritikin was then called as a witness and testified that he was an accountant licensed to practice before the IRS in representing the interests of taxpayers as an "enrolled agent." Pritikin testified that Gambino retained him in June 2002 to represent him with regard to "payroll tax problems." He testified that Gambino and United owed the IRS between $125,000 and $150,000. Pritikin told Gambino that the IRS could shut United down if the tax liability was not settled. Pritikin testified that Gambino told him

20

that he was going to borrow money against some of his properties with the assistance of Sal so that he could settle United's liability with the IRS.

Pritikin testified that Gambino directed him to speak with Sal in November 2002, and Sal told him he was employed by Boulevard and could obtain loans on Gambino's properties. Sal sent Pritikin via facsimile a loan commitment from Boulevard showing Gambino approved for a loan signed by Sal.

On August 7, 2003, Pritikin spoke with Sal requesting documentation regarding a refinance or sale of Gambino's properties because the IRS was threatening to seize United. Pritikin testified that he never received any documentation from Sal regarding a refinance or sale of the subject properties.

Stephen Link, an attorney since 1995, was called as a witness. He testified that he was Gambino's counsel from 2002 until shortly after the instant case was filed, when he withdrew. Link testified that he was never made aware that any loans were procured on the subject properties. Link filed an appearance in the Zippershtein foreclosure suit, and when the suit was dismissed, Gambino was "surprised" and told Link that "someone had paid off the mortgage."

Sal was then called by plaintiffs as an adverse witness. Sal testified that at the time of trial, he was unemployed. He testified that he never held employment where he earned a salary or wage, and had never received unemployment benefits. He testified that he had been living on moneys borrowed or gifted from family members. Sal testified that he had not held a bank account for approximately 12 to 15 years, and that he conducted all his financial transactions in cash and on rare occasions by cashier's check. Sal identified the loan commitment sent to Pritikin by facsimile transmission, on

21

Boulevard letterhead, and identified his signature on the document above the signature line as the "authorized signature."

Sal testified that had known Koonce since the fall of 2001 and that Koonce was an attorney and owned both Boulevard and Title America. Sal testified that he never represented to anyone that he worked for Boulevard. Sal testified that he and Enzo "had a couple of business transactions going on" with Koonce regarding Gambino. He testified that Koonce lent money to both him and Enzo and they gave the funds totalling $180,000 to Gambino.

Sal testified that his role in the transactions described in the plaintiffs' complaint was limited, but admitted he attended at least five of the closings at issue. He was shown all the documents that plaintiffs claimed had forgeries of Gambino's signatures; of the documents he recognized, he claimed that all of them were signed by Gambino in his presence. Sal identified the notary of Gambino's signature on all of the contested documents as that of Regina Brophy, who worked as a legal secretary for the Cook County public defender's office in Markham, Illinois, where Sal's uncle, Thomas Gambino, was employed as a supervisor of criminal investigations. Sal testified that it was his practice to have Gambino sign the documents at United's Niles location, drive the documents to Brophy in Markham, together with a copy of Gambino's driver's license, and present it to her to be notarized.

Sal testified that he never kept any money for his participation in the various transactions involving the subject properties. When Sal was first approached by Gambino in the fall of 2002 about refinancing his properties, Gambino signed various authorizations allowing Sal to obtain Gambino's credit report. He also received a list of

Gambino's properties, showing their value and mortgage indebtedness. The listing showed that the Niles Property had an estimated value of $550,000 with no mortgage debt, the Kedzie property had an estimated value of $1.2 million with no mortgage debt, and the Lavergne Property had an estimated value of $450,000 with a mortgage debt of $223,000.

Sal testified that he and Wolf were present at the December 20, 2002, closing. Sal testified that Gambino had signed all the relevant legal documents prior to the closing. Sal testified that he prepared the accounting of the funds distributed at the December 20, 2002, closing. He testified that the accounting showed that Koonce earned an attorney's fee of $750, Enzo received a check for $5,000 for the appraisal, and that he received a check for $25,000 which he converted to cash and gave to Gambino.

Sal testified that he made loans to Gambino, totaling $770,000, but could not provide an accounting. Sal testified that Gambino owed him a balance between $150,000 and $200,000.

In early 2005, Sal worked with WW Funding, which held title the Kedzie Property and had the locks changed. Sal also testified that he made repairs to the Lavergne Property after Boulevard had acquired title to the property.

Sal deposited a cashier's check payable to Gambino for $42,586.09 into one of Gambino's accounts concerning the Niles Property. Sal identified a check that Gambino paid to either Sal or Enzo for unpaid property taxes in the amount of $24,067.48, which showed up in a deposit into Enzo's account of $24,067.48 on December 30, 2002, and showed no withdrawals on that date.

23

Sal testified that Gambino was not at the Kedzie closing but had signed all the closing documents in Sal's presence, and Sal then delivered the documents to the closing.

Sal was shown an entry on the disbursement sheet of a $25,000 payment made to the "Norman Trust Account" to "payoff investor." At first, Sal testified that the Norman Trust payment constituted repayment of an investor on behalf of Gambino, but then admitted this payment was made to fund a settlement of a suit against him for fraud.

The parties stipulated that a $25,000 cashier's check drawn on Title America's account at Harris Bank payable to Enzo's girlfriend Kathleen Papiese was funds deposited into Papiese's bank account and that Enzo was a signatory to that account.

Sal testified that a payment of fees to a law firm Casale, Woodward & Bulls for $5,372.72 was not for Gambino's benefit, although it originated from a mortgage placed on the Kedzie Property.

Sal testified that he prepared the April 30, 2003, disbursements on the Lavergne Property, claiming that $130,000 in cash was given to Gambino.

Sal admitted that no funds were given to Gambino from the Kedzie Property closing. Checks were written to Marc Smith, which were ultimately disbursed to WW Funding. Plaza Bank provided the financing for this transaction. Sal testified that he also procured Gambino's signature on an assignment of an option that allowed WW Funding to acquire the Kedzie Property by paying off the Century loan.

Sal claimed Gambino had given him a power of attorney for the Niles Property. Sal signed the HUD statement, in which $135,171.38 was disbursed to WW Funding. No funds were written to Gambino. In this transaction, WW Funding purportedly purchased

24

the Niles Property from Gambino for $230,000 based on a contract on which Sal claimed he had procured Gambino's signature.

Regina Brophy, a 25-year legal secretary for the office of the Cook County public defender in Markham, testified at trial. She is a notary public who worked with Thomas Gambino. She testified she notarized signatures for Sal without ever seeing the people who signed the documents or knowing whether they were genuine. She testified, "I just trusted him."

Thomas Gambino testified that he was a supervisor of criminal investigations in the public defender's Markham office. Sal and Enzo are his nephews. He testified that he attended a meeting in late 2004 with Gambino, Enzo and Sal, at Enzo's request, to help Enzo "straighten out" some problems he and Sal were having with Gambino. He testified that his role at this meeting was as a mediator, because whatever business deals Sal and Enzo had with Gambino were nearing a "complete breakdown."

Thomas testified that Gambino explained he had engaged in conversations with Sal and Enzo about selling his properties and possibly retiring when Gambino received notification from his bank that one of his properties had been sold without his knowledge, and he ordered them to stop doing anything further. Gambino said that he gave Sal and Enzo permission to sell one of his properties, but Thomas did not identify which property Gambino was referring to.

Sal said Gambino "was confused and did not quite understand how the deal was put together." When asked how it was that Gambino had lost control of his properties, Sal said "that it had to be part of the deal because [the investors had] to have more assurance and *** more property," in order for the deal to proceed. Sal said that he had

25

given Gambino $60,000 in "good faith" money and that more moneys would be paid Gambino at "the close of the deal."

Gambino requested his properties back and Sal told Gambino the deals were "nonreversible." Sal said the investors "were people that you don't fool around with once [you] make a deal."

Steven Fritzshall, a licensed attorney since 1981, was then called as a witness. He represented Zippershtein in connection with the mortgage on the Niles Property. In connection with this transaction he testified that Koonce claimed that he was Gambino's attorney.

In December 2003, Fritzshall wrote to Gambino regarding a default on the Zippershtein mortgage. Gambino responded, "In response to your letter, I have told Mr. Zippershtein several times the loan you are referring to was not made by me. I did not receive any loan from Mr. Zippershtein. The loans you are referring to are not valid."

Barry Mullin testified that in 2003, he was employed as a personal banker for LaSalle Bank/ABN Amro, which had held a mortgage on the Lavergne Property. Gambino asked him to find out how his loan had been paid. Mullin called Koonce, who "informed [Mullin] he had paid off the mortgage because [the property] had been deeded to him."

David Azran testified that he was the sole shareholder of Century, which was the lender involved in the first transaction related to the Kedzie Property. He made the loan as a result of a call he received from Zippershtein and Wolf. They told him the transaction was a "sale/leaseback" of $200,000, with interest at 18% per year. The transaction was structured so that if the borrower did not pay the loan within a year,

Century would have the right to retain title to the property given to it as security for the debt. He testified that, Azran, Wolf, and Zippershtein agreed to share in ownership if the purchase option was never exercised.

Phillip Cali testified that he was an independent agent for Service Insurance Agents and was Gambino's insurance agent. Cali testified that the certificate of insurance concerning the Niles Property was not authentic and did not bear his signature.

Rogelio Llamedo testified that he owned, developed and managed property in Chicago. He met Gambino in early 2006. Llamedo testified, over an objection under the Dead-Man's Act (735 ILCS 5/8-201 (West 2006)), that on January 12, 2006, he entered into a contract to purchase the Kedzie Property from Gambino for $1.4 million. On that date, Llamedo also entered into a contract to purchase the house adjacent to the Kedzie Property. It was his intent to develop the properties. He testified that he had the financial ability to close on the contract to purchase the Kedzie Property in January 2006 and retained that ability at the time of trial.

Diane Marsh, a forensic document examiner, was qualified as an expert handwriting witness. She compared Gambino's known handwriting samples with the questioned documents at issue. Marsh testified that experts in her field utilize a hierarchy of conclusions, ranging from the most certain to the least certain. The highest degree of confidence is called an identification, which means that the forensic document examiner has no reservations concerning the authenticity of the signature. In expressing her opinion regarding the authenticity of the suspect signatures, Marsh utilized the highest level of certainty.

Marsh described at length the procedures she followed in reaching her conclusion and the basis for the three separate reports she issued in the case. Marsh's examination involved the detection of possible autoforgery, which are instances "where somebody tries to disguise their own signature so they can deny it later." Simulations, on the other hand, are signatures of a third party meant to appear authentic. She testified that it is extremely difficult to create a series of autoforgeries that could escape detection. Her conclusion was, "Mr. Gambino did not disguise his own signatures," and the 39 signatures contained on plaintiffs' exhibits Nos. 5 through 43 were not Gambino's. It was also her opinion that all but one of the questioned documents were signed by the same person, and that the one questioned document was also not signed by Gambino.

On cross-examination Marsh testified that the handwriting samples that she considered in reaching her opinion were all tendered by Gambino, and that she did not use the retainer check for her services as one of the samples in reaching her opinion.

Dennis Koonce, a licensed attorney since 1986, was called as an adverse witness. Koonce is the sole shareholder of Title America and Boulevard. Title America acted as the "policy issuing agent" for five of the six transactions. The one exception was the second transaction related to the Niles Property.

Koonce was shown the loan application in connection with the first Lavergne closing, dated April 30, 2003. Koonce signed it and certified the accuracy of the information; in it, he listed the Lavergne Property as one of his own properties, claiming he had acquired it in 1995. The application for the loan was submitted as a refinance. He was then shown a purported trust agreement between Koonce and North Star as trust No. 13534, dated April 9, 1962, signed by Koonce. Koonce was shown copies of leases

28

pertaining to the Lavergne Property when he was the lessor, although the dates of the leases preceded the first transaction concerning the Lavergne Property. Koonce identified his signature on the leases.

Koonce identified the Real Estate Settlement Procedures Act (RESPA) form from the closing concerning the refinancing transaction of the Lavergne Property on December 17, 2003, which he signed. He identified a similar set of leases that had been submitted to Washington Mutual regarding the Lavergne Property, and a mortgage loan application signed by him for $800,000 regarding the Niles and Kedzie Properties. He testified that, in the schedule listing real estate owned, he had listed the Niles, Kedzie and Lavergne Properties as his own.

Koonce identified his agreement with WW Funding to acquire the Niles and Kedzie Properties granting him an option to acquire the properties after WW Funding had paid off Century and Zippershtein. Koonce testified that he had entered into this series of agreements for the benefit of Gambino. He claimed "the money that I advanced to [Gambino] was going to be lost and these properties were not saved so in an effort to save them yes I did and [Gambino] did nothing to preserve that."

Enzo was then called as an adverse witness. Enzo was asked about the funds shown as being disbursed to him and to his girlfriend from various transactions, and he admitted receiving them.

Stephen Wolf was then called as an adverse witness. He had been a real estate investor for 40 years. Wolf said he never paid Gambino anything when he acquired the Kedzie Property from Century or when he acquired the Niles Property by paying off the Zippershtein loan. Wolf estimated the value of the Niles Property as between $550,000

29

and $700,000. He testified that Gambino's name appeared nowhere in connection with the various option agreements granted to Koonce.

Wolf testified he met with Gambino prior to the refinancing transaction on the Kedzie Property, prior to granting Koonce an option. He said that during this meeting, no terms were discussed, but he had requested that, if a problem arose, Gambino should contact him. Wolf testified that Gambino was not accompanied by an attorney. Wolf identified an outline of the agreement WW Funding was to have with Koonce regarding the Kedzie Property. Wolf did not have Gambino sign it to indicate his assent. Wolf admitted that he never attempted to communicate with Gambino when problems arose concerning the Koonce option.

Joseph M. Gambino was the independent administrator of his father's estate. He had worked at the transmission shop his father operated at the Kedzie Property and was familiar with the manner in which Gambino carried on his business. He was familiar with Gambino's signature and had observed him sign documents many times. He was shown the signatures on plaintiffs' exhibits Nos. 5 through 43, and he testified that the signatures were not his father's.

### b. Defense Witnesses

Enzo testified that he met with Gambino in 2002. He testified, over an objection under the Dead-Man's Act, that Gambino agreed to the purchase price of $2.8 million for the subject properties and the house adjacent to the Kedzie Property, which Gambino also owned. To raise the money, Sal introduced Enzo to Koonce, to help him obtain financing. Gambino told Enzo he did not have books that would substantiate his business profit and loss.

30

Plaintiffs' exhibit No. 151 was a listing of checks Enzo received, which he claimed he had cashed and the proceeds of which he had given to Gambino, either in the form of currency or cashier's checks. Enzo never obtained a receipt.

Enzo thought he was going to be taking over Gambino's business in January of 2003. However, he testified that Gambino decided not to allow him to assume control. Inspections were performed on the Kedzie Property and Gambino allowed the inspection. Enzo testified that the $25,000 received by Enzo's girlfriend was later converted to cash, cashier's checks or money orders and delivered to Gambino.

Regarding the wire transfer of $110,000 to his account from the first closing concerning the Lavergne Property, Enzo testified he delivered these funds to Gambino in cash.

After Enzo met with Gambino and Thomas Gambino in late 2004, he went to the Kedzie Property to "clean-up." At the same time, he also applied for a business license and had several meetings with Gambino. In February 2005, Gambino "had [him] arrested for trespassing." Enzo made arrangements to move underground storage tanks at the Niles Property in July 2004. Enzo identified various permits he obtained from governmental agencies regarding work to be performed at the Niles and Kedzie Properties.

On cross-examination, Enzo was unable to recall any document signed by Gambino memorializing any agreement between Gambino and Enzo or Sal with regard to the subject properties. Enzo admitted receiving a letter from Gambino dated December 16, 2004, to cease any activity with regard to the subject properties. In February 2005,

31

Enzo had the locks changed at the Kedzie Property at the instruction of WW Funding. Enzo did not believe that Gambino had any further interest in the building at the time.

Sal also testified in defendants' case-in-chief and identified a credit report that he had obtained concerning Gambino. Based upon that credit report, Sal made inquiries to Adam Wolf to find a collateral-based lender, and Adam recommended his father. Sal met with Wolf, who told him that Zippershtein would be interested in making such a loan. Sal testified that he was present in December 2003 when Wolf met with Gambino and when Gambino authorized Sal to act on his behalf.

Koonce also testified in defendants' case-in-chief and testified that he never told anyone he represented Gambino. He testified that he had no knowledge that the trustee's deeds may have been forged. Koonce identified the back real estate taxes owed on several of the subject properties, insurance certificates regarding the properties and various payments he made regarding the Lavergne Property.

The trial court ruled that although Gambino had died during the course of his discovery deposition and had not signed the transcript of his deposition or been afforded an opportunity to examine the transcript to make corrections, sections of his deposition would be admitted into evidence, not as binding judicial admissions, but as evidentiary admissions by a party opponent. These admissions were then read into the record.

At his discovery deposition, Gambino admitted to having North Star execute trustee's deeds conveying legal title to him, but that he later had those deeds cancelled. Gambino admitted receiving two checks for $10,000 each on January 8, 2003, and January 28, 2003, from Sal. He also admitted receiving a check for $42,586.09, but claimed that Sal requested a check from him for $24,067.48 in return. He also admitted

receiving cash from Sal or Enzo on two occasions; one for $5,000, and another for $2,000. Further, he admitted to accompanying the appraiser through the Niles Property during the late 2002 appraisal.

Stephen Wolf testified in defendants' case-in-chief that he became involved in the transactions at issue through his son, Adam. At that time, he shared an office with Zippershtein. He testified that he had a meeting with Gambino and Zippershtein immediately before the first transaction concerning the Niles Property and received a fee, and then another fee concerning the Kedzie Property. He never became aware of any claim that Gambino's signature was forged.

In December 2003, Sal approached Wolf requesting a loan secured by the Kedzie Property. Wolf made arrangements with Plaza for funding that transaction, and prior to closing, met with Gambino. As part of that transaction, an option was given to Koonce to acquire the property by repaying the interest, fees and principal balance of WW Funding's loan. The option was given to Koonce, not Gambino, because Koonce was creditworthy. Sal told him that Gambino had no problem with the arrangement.

## 4. The Trial Court's Findings

The trial court rendered its "Findings of Fact and Judgment after Trial" in a 21-page written memorandum opinion and order. The trial court found in favor of plaintiffs on all counts of plaintiffs' complaint to quiet title and for slander of title.

The trial court found that plaintiffs' evidence was overwhelming that the purported trustee's deeds conveying title to the subject properties were forged, which evidence included the testimony of Castillo and Robinson that they had not signed the trustee's deeds used to effectuate the disputed conveyances, and the testimony of Brophy,

33

who admitted to notarizing the trustee's deeds, as well as approximately 40 other documents used to accomplish the disputed conveyances, at the request of Sal without seeing the signatories or recognizing the signatories' signatures. The trial court also found the expert testimony of Marsh "extremely credible, thoroughly articulated, and well-supported." The trial court found that defendants offered no evidence to refute this testimony. Further, the trial court discounted Sal's testimony, including the portions related to Gambino signing the disputed documents, finding it to "be zero in all respects."

Further, the trial court found that by their acts Sal, Enzo, Koonce, Boulevard, Title America, Wolf, and WW Funding had slandered plaintiffs' title to the Kedzie and Niles Properties. With respect to the Lavergne Property, the trial court found that by their acts Sal, Enzo, Koonce, Boulevard, and Title America had slandered plaintiffs' title. In its order, the trial court deferred its findings as to compensatory damages until a later date and ordered plaintiffs' attorneys to submit a fee petition. The trial court did assess punitive damages in the following amounts on November 30, 2007: the trial court imposed punitive damages against Enzo, Sal, and the Koonce defendants, jointly and severally, in the amount of $500,000, and against Wolf and WW Funding, jointly and severally, in the amount of $175,000.

On May 2, 2008, the trial court issued a seven-page memorandum opinion and order where it awarded compensatory damages to plaintiffs.[5] In its memorandum opinion and order, the trial court described plaintiffs' petition for attorney fees. The trial court indicated that the suit was brought when Gambino was still alive. Link was the attorney

---

[5] The trial court's May 2, 2008, order also denied two Illinois Supreme Court Rule 137 petitions for sanctions. 155 Ill. 2d R. 137.

34

engaged for the lawsuit. He drafted the originally filed complaint and a motion for temporary restraining order. The fee arrangement between Link and Gambino was set at an hourly rate of $185. Link submitted a copy of his billings for the period of March 1, 2005, to March 15, 2005, totaling $7,085.

Shortly after the filing of the lawsuit, Gambino engaged additional counsel, Sam Amirante. On March 22, 2005, Gambino agreed to a $10,000 retainer and a contingency fee of one-third of any recovery. Link and Amirante withdrew their appearances on March 31, 2006. Arimante accepted the $10,000 and made no further claim for fees.

On March 31, 2006, Gambino engaged new counsel. New counsel were attorneys Michael Braun, Sherwin Winer, and Kevin O'Rouke. Initially, all three attorneys billed monthly at an hourly rate. Within a short time, however, Gambino was unable to keep current in paying his attorney fees. Counsel were unwilling to continue working on an hourly basis when their bills were not being paid and would not agree to deferring payment until the conclusion of the case. It was agreed that while billing would continue on an hourly basis, all amounts unpaid would be treated under a contingency fee agreement. Specifically, all unpaid hourly fees would be paid at three times the amount billed if and when the case reached successful conclusion. Costs were to be treated in the same manner. The attorneys' billings were attached to the fee petition. Braun billed at $205 per hour; Winer at $250 per hour; and O'Rouke at $150 per hour for out-of-court time and $200 per hour for in-court time. A total of $187,196 in bills was unpaid and thus subject to the contingency enhancement.

The Koonce defendants and the Wolf defendants both objected to plaintiffs' petition for attorney fees. Both sets of defendants argued that no Illinois authority

35

allowed the multiplier of three to be applied to the lodestar amount. Further, the Wolf defendants argued that the petition failed to properly segregate the attorneys' billings for plaintiff's claims to quiet title and plaintiffs' claims for slander of title. They argued that only plaintiffs' attorney fees incurred in quieting title were recoverable.

The trial court first rejected the Wolf defendants' argument that only plaintiffs' attorney fees incurred for plaintiffs' quiet title claims were compensable, finding that plaintiffs' claims to quiet title and for slander of title were inextricably linked. The trial court then addressed the reasonableness of the attorney fees exclusive of the multiplier, and found that the attorneys' hourly rates were reasonable. The trial court found all itemizations sufficiently detailed, noting its own familiarity with the entire context of the trial court proceedings. The trial court found the time billed for each item appropriate, recognizing the difficulties presented by the multidefendant, multiproperty case and the expertise of plaintiffs' counsel.

Finally, the trial court rejected defendants' objections to the use of a multiplier of three times the lodestar, finding that the measure was "imminently reasonable." The trial court found that the hourly rates were modest and that the attorneys' itemized time appropriate. Further, the trial court found that the fee was proportionate to the value of the properties at issue, roughly $2.5 million.

Noting that the Wolf defendants had no involvement with respect to the contested transactions related to the Lavergne Property, the trial court segregated the attorney fees incurred with respect to the Lavergne Property from the remainder of the petition and awarded the following accordingly: attorney fees in the form of compensatory damages in the amount of $595,574 on counts IV and VI of plaintiffs' complaint, such damages

36

imposed jointly and severally against Sal, Enzo, and the Koonce defendants; attorney fees in the form of compensatory damages in the amount of $556,485 on counts IV and VI on plaintiffs' complaint, such damages imposed jointly and severally against Wolf and WW Funding; and attorney fees in the form of compensatory damages in the amount of $595,574 on count II of plaintiffs' complaint, imposed jointly and severally against Sal, Enzo, and the Koonce defendants. The court found that plaintiffs were to have only one recovery of compensatory damages, and the judgments entered were not cumulative.

### 5. Notices of Appeal

As noted, multiple appeals were taken from the trial court's November 30, 2007, and May 2, 2008, orders. The appeals were consolidated on this court's own motion.

Sal and Enzo filed a timely notice of appeal, but have failed to file a brief with this court. The Koonce defendants have appealed from both the November 30, 2007, and May 2, 2008, orders and the judgments entered against them. The Koonce defendants raise no arguments with regard to the trial court's finding against them on their counterclaims, and as a result all arguments concerning their counterclaims are waived. 210 Ill. 2d R. 341(h)(7). Wolf and WW Funding have appealed from both the November 30, 2007, and May 2, 2008, orders and the judgments entered against them. Although WW Funding filed a notice of appeal from the trial court's November 30, 2007, order, where the trial court found against its counterclaim to quiet title to the Kedzie and Niles properties, WW Funding raises no argument with respect to those findings. Further, as noted, at oral argument before this court, WW Funding explicitly waived any claims to quiet title to the Kedzie and Niles Properties. As such, any argument concerning its counterclaim is waived. 210 Ill. 2d R. 341(h)(7). Plaza Bank has appealed the trial

37

court's judgment with respect to its finding to quiet title to the Niles Property. Washington Mutual (Washington Mutual did not file a notice of appeal from the trial court's quiet title findings) and Plaza Bank filed a notice of appeal from the trial court's denial of their Rule 137 motion for sanctions. Plaintiffs filed a notice of appeal from the trial court's denial of their Rule 137 motion for sanctions.

## ANALYSIS

On appeal, the defendants, collectively, raise a myriad of arguments with respect to the trial court's findings. The Koonce defendants (Koonce, Boulevard, and Title America) attack the trial court's findings with respect to plaintiffs' claims for quiet title and slander of title, and the trial court's assessment of damages against them, including its assessment of compensatory damages for plaintiffs' attorney fees and its assessment of punitive damages. The Wolf defendants (Wolf and WW Funding) only raise arguments with respect to the trial court's slander of title findings and its assessment of damages against them, including its assessment of compensatory damages for plaintiffs' attorney fees and its assessment of punitive damages. Plaza Bank's arguments on appeal concern only the trial court's findings with respect to plaintiffs' claim to quiet title to the Niles Property.

### 1. Standards of Review

A trial court's decision following a bench trial is reviewed to determine if the judgment is against the manifest weight of the evidence. *Smith, Allen, Mendenhall, Emons & Selby v. Thomson Corp.*, 371 Ill. App. 3d 556, 558 (2006). A judgment is not against the manifest weight of the of the evidence unless the opposite conclusion is

clearly evident. *Ikari v. Mason Properties*, 314 Ill. App. 3d 222, 228 (2000), citing *Jordan v. National Steel Corp.*, 183 Ill. 2d 448, 456 (1998).

A trial court's decision awarding attorney fees is reviewed under the abuse of discretion standard. *Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 485 (1999). "A trial court does not abuse its discretion unless, in view of all the circumstances, its decision so exceeded the bounds of reason that no person would take the view adopted by the trial court." *In re Marriage of Demar*, 385 Ill. App. 3d 837, 852 (2008).

On appeal from a bench trial, the question of whether punitive damages are available as a matter of law for a cause of action is reviewed *de novo*. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138 (2004). The question of whether the facts prove willfulness or other aggravating factors justifying the imposition of punitive damages is a factual determination that is reviewed using the manifest-weight standard. *Franz*, 352 Ill. App. 3d at 1137-38. The trial court's decision to award punitive damages is reviewed for an abuse of discretion. *Franz*, 352 Ill. App. 3d at 1138.

## 2. Quiet Title

We begin with the trial court's findings with respect to plaintiffs' quiet title claims. As noted, counts I, III, and V, of plaintiffs' complaint sought to quiet title to the subject properties. On November 30, 2007, the trial court found in favor of the plaintiffs on those counts based on its finding that the evidence at trial showed "overwhelming[ly]" that the written instruments used to convey title to the subject properties from plaintiffs were forgeries.

An action to quiet title in property is an equitable proceeding in which a party seeks to remove a cloud on his title to the property. *Stahelin v. Forest Preserve District of Du Page County*, 376 Ill. App. 3d 765 (2007). A cloud on title is the semblance of title, either legal or equitable, appearing in some legal form but which is, in fact, unfounded or which it would be inequitable to enforce. *Lakeview Trust & Savings Bank v. Estrada*, 134 Ill. App. 3d 792, 812 (1985). "Various forms of documents which appeared valid on their face have been held to constitute clouds on title." *Lakeview Trust & Savings Bank*, 134 Ill. App. 3d at 812, citing *Johnston v. Masterson*, 397 Ill. 168, 172 (1947) (subsequent deed to second grantee), *Johnson v. Riedler*, 395 Ill. 412, 417 (1946) (recorded mortgage), and *Oswald v. Newbanks*, 336 Ill. 490, 496 (1929) (forged deed).

" 'It is a fundamental requirement in an action to quiet title or in an action to remove a cloud from a title that the plaintiff must recover on the strength of his own title, although it is not required that a perfect title be established.' " *Lakeview Trust & Savings Bank*, 134 Ill. App. 3d at 812, quoting *Reynolds v. Burns*, 20 Ill. 2d 179, 193 (1960). Thus, a plaintiff cannot claim that there is a cloud on his title, unless he actually has title. *Lakeview Trust & Savings Bank*, 134 Ill. App. 3d at 812, citing *Ford v. Witwer*, 383 Ill. 511, 514 (1943); *Klingel v. Kehrer*, 81 Ill. App. 3d 431, 439 (1980); *Aebischer v. Zobrist*, 56 Ill. App. 3d 151, 154 (1977).

"The essential elements of a forgery are (1) a false writing or alteration of some instrument in writing; (2) the instrument must be apparently capable of defrauding; and (3) there must be an intent to defraud." *In re Estate of Bontkowski*, 337 Ill. App. 3d 72, 76 (2003), citing *Haffa v. Haffa*, 115 Ill. App. 2d 467 (1969). The validity of signatures on a deed of conveyance can be overcome only by clear and convincing evidence from

disinterested witnesses. *Estate of Bontkowski*, 337 Ill. App. 3d at 76, citing *Witt v. Panek*, 408 Ill. 328 (1951); *Resolution Trust Corp. v. Hardisty*, 269 Ill. App. 3d 613 (1995).

A trial court's determination as to these matters will not be disturbed unless it is against the manifest weight of the evidence. *Estate of Bontkowski*, 337 Ill. App. 3d at 76, citing *Resolution Trust Corp.*, 269 Ill. App. 3d at 617. A trial court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Ikari v. Mason Properties*, 314 Ill. App. 3d 222, 228 (2000), citing *Jordan v. National Steel Corp.*, 183 Ill. 2d 448, 456 (1998).

With regard to the trial court's findings as to plaintiffs' claims to quiet title, the Koonce defendants first argue that the validity of North Star's title to the subject properties was never established. They argue that no evidence was presented as to the title of the subject properties "at any time, before or after the transfers," and that the trial court's quiet title findings should be reversed on this basis alone. This argument is not persuasive.

First, the Koonce defendants' counterclaim verified by the sworn affidavit of Koonce alleged that "North Star *** held title to the [subject] properties in trust, with Gambino as the beneficiary." This binding judicial admission removed the question of the validity of North Star's title to the subject properties from contention. *Winnetka Bank v. Mandas*, 202 Ill. App. 3d 373, 396 (1990). Second, the evidence at trial establishing the validity of North Star's title to the subject properties was uncontroverted. Castillo, North Star's trust officer, testified that Gambino was the sole beneficiary of three land

41

trusts holding legal title to the subject properties under trust agreements Nos. 13534, 23985, and 23994, until the time of his death.

The Koonce defendants then argue that the alleged clouds on title to the subject properties and the alleged forgery of the trustee's deeds to the subject properties were never proven.

A cloud on title is the semblance of title, either legal or equitable, appearing in some legal form but which is, in fact, unfounded or which it would be inequitable to enforce. *Lakeview Trust & Savings Bank v. Estrada*, 134 Ill. App. 3d 792, 812 (1985). It is undisputed that the questioned trustee's deeds conveying legal title out of trust were recorded against the subject properties, along with other legal documents used to convey title to the subject properties and procure loans using the subject properties as security. Further, mortgage liens were recorded against all three of the subject properties. The Koonce defendants argue that the trustee's deeds conveying title to the subject properties out of trust were improperly admitted into evidence. However, a review of the record demonstrates that the trustee's deeds were admitted into evidence without objection. See *In re Stephen K.*, 373 Ill. App. 3d 7, 22 (2007) (waiver).

The Koonce defendants then argue that the trial court's finding that the evidence that the purported trustee's deeds conveying legal title to the subject properties, and other legal documents used in the contested transactions, were forged, was against the manifest weight of the evidence. *Estate of Bontkowski*, 337 Ill. App. 3d at 76 (a trial court's finding of forgery is reviewed under the manifest-weight standard).

The bank officers whose signatures purportedly appear on the trustee's deeds testified that they did not sign the deeds and that the signatures purporting to be theirs

42

were not.  The notary whose seal and signature appears on the trustee's deeds also testified to notarizing the trustee's deeds, as well as approximately 40 other legal documents, each at the request of Sal, without seeing the signatories, knowing the signatories, or having any familiarity with the signatories' signatures.  The notary further admitted to notarizing the purported signature of Gambino contained on the deeds to the Niles and Kedzie Properties conveying title to WW Funding and Century, respectively, at Sal's request, without seeing Gambino, knowing his signature, or having any familiarity with his signature.

Further, Marsh, plaintiffs' handwriting expert and a disinterested witness, opined that the signatures contained on a series of contested documents purporting to be that of Gambino, including the deeds conveying title to the Niles and Kedzie Properties to WW Funding and Century, were not Gambino's.

Despite the foregoing, the Koonce defendants argue that the trial court's finding as to forgery was against the manifest weight of the evidence because the trial court failed to make a specific finding of an intent to defraud.  *Estate of Bontkowski*, 337 Ill. App. 3d at 76.   A reviewing court may affirm the trial court's judgment on any basis which appears in the record, regardless of the basis relied upon by the circuit court. *Estate of Bontkowski*, 337 Ill. App. 3d at 78.  " 'The real issue on appeal is not the reasoning of the [trial] court nor the basis for its decree, but whether its decree was correct.' " *Estate of Bontkowski*, 337 Il. App. 3d at 78, quoting *La Salle National Bank v. International Ltd.*, 129 Ill. App. 2d 381, 390-91 (1970).  Again, a trial court's findings as to the elements of forgery, including the determination of an intent to defraud, are

43

reviewed under the manifest-weight standard. *Estate of Bontkowski*, 337 Ill. App. 3d at 78.

In the present case, there was ample evidence of the Koonce defendants' intent to defraud by the use of the forged documents. The Koonce defendants, relying on the testimony of Sal, argue that Gambino signed the contested documents in Sal's presence. First, we note that the trial court found Sal's credibility to be "zero" in all respects. The determination of witnesses' credibility is a matter for the trier of fact and will not be second-guessed on appeal. *Franz*, 352 Ill. App. 3d at 1144. Plaintiffs' expert, who was not contradicted at trial, opined that Gambino did not sign the contested documents. The trial court found the contested documents were signed by someone other than Gambino for the advantage of several defendants in the case at bar, including Sal, which illustrates an intent to defraud. "Intent to defraud is a question of fact, which may be proved by circumstantial evidence and inferred from the facts and circumstances surrounding the transaction." *People v. Aguilar*, 366 Ill. App. 3d 341, 344 (2006).

Here, the settlement documents on the subject properties provide direct and circumstantial evidence of fraud. The Niles Property alone had $25,000 in commitment fees distributed to the Wolfs and Zippershtien, a mortgage escrow of $33,000 which is unusual, a $5,000 appraisal fee, and a payment to Sal of $25,000 that is questionable on its face. The Kedzie settlement disbursements reveal commitment or loan fees of $18,750, a $25,000 payment to "Norman Trust Account," and $5,372.72 to a law firm not involved in the process, and over $50,000 to unknown people (Halle, Guillermo, and Papiese) and only $10,000 to Gambino, which should have indicated to the Koonce defendants that an explanation was in order. The disbursements on the Lavergne

44

Property were just as bizarre with no funds going to Gambino and $120,000 to Enzo, with loan fees over $7,000, and an unexplained disbursement to Harris Bank for $10,000.

The case of *In re Estate of Bontkowski*, 337 Ill. App. 3d 72 (2003), is instructive here. In that case, the proof of an alleged forged deed was found sufficiently established by testimony of a handwriting expert that the signatures on a deed were not those of the decedent and by testimony of a notary who affixed her signature and notary seal to the deed. Like this case, in *In re Estate of Bontkowski*, the notary admitted that someone other than the signatory had given her the deed to notarize, that the signatory was not present when she notarized the deeds, that she had never met the signatory, and that she did not know the purported signatory's signature. Based on that evidence, the appellate court affirmed the trial court's findings that the elements of forgery had been met, including intent to defraud. *In re Estate of Bontkowski*, 337 Ill. App. 3d at 77.

Like *In re Estate of Bontkowski*, the trial court's finding in the case at bar that the signatures, the trustee's deeds, the deeds conveying the Kedzie and Niles Properties from Gambino to WW Funding and Century, and other documents used in the contested transactions were forged was not against the manifest weight of the evidence.

The Koonce defendants then argue that Gambino authorized and/or ratified the transactions.

An agent's authority may be actual or apparent and, if actual, may be express or implied. *Granite Properties Limited Partnership v. Granite Investment Co.*, 220 Ill. App. 3d 711, 713-14 (1991). Apparent authority is cognizable when a principal, through words or conduct, creates the reasonable impression in a third party that his agent is authorized to perform a certain act on his behalf. To prove the existence of apparent

45

authority, a party must establish that: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) the third party, based upon his knowledge of the facts, possessed a good-faith belief that the agent possessed such authority; and (3) the third party relied to his detriment on the agent's apparent authority. *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill. App. 3d 383, 390 (1991). The party alleging an agency relationship must prove it by a preponderance of the evidence. *Granite Properties Limited Partnership,* 220 Ill. App. 3d at 714.

"Ratification occurs when the principal learns of an unauthorized transaction, then retains the benefits of the transaction or takes a position inconsistent with nonaffirmation." *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 858 (1998), citing *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 310 (1992). "For ratification to occur, the principal must, with full knowledge of the act, manifest an intent to abide and be bound by the transaction." *Stathis*, 295 Ill. App. 3d at 858, citing *Peskin v. Deutsch*, 134 Ill. App. 3d 48, 55 (1985). "Ratification may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction." *Stathis*, 295 Ill. App. 3d at 858, citing *Progress Printing Corp.*, 235 Ill. App. 3d at 310.

The Koonce defendants argue that the fact that Gambino executed three written directions to convey and requested trustee's deeds from North Star "gave Gambino the opportunity to create fraudulent deeds himself, which he ultimately delivered to Sal to be recorded." The Koonce defendants argue that Gambino had possession of the trustee's deeds for approximately a month before returning them to North Star giving Gambino, or Sal with Gambino's "encouragement and authorization," an opportunity to prepare the

46

fraudulent deeds. The Koonce defendants also point out that the trustee's deeds that Gambino did indeed request from North Star and the contested trustee's deeds are mirror images. They reason that this fact proves that Gambino provided and encouraged Sal with the opportunity to forge the questioned trustee's deeds. Again, when we analyze the settlement documents on the subject properties, the disbursements appear to be tainted with fraud. The Niles Property alone had $25,000 in commitment fees distributed to the Wolfs and Zippershtein, a mortgage escrow of $33,000, which is unusual, a $5,000 appraisal fee, and a payment to Sal of $25,000 that is questionable on its face. The Kedzie settlement disbursements reveal commitment or loan fees of $18,750, a $25,000 payment to "Norman Trust Account," and $5,372.72 to a law firm not involved in the process, and over $50,000 to unknown people (Halle, Guillermo, and Papiese) and only $10,000 to Gambino, which should have indicated to the Koonce defendants that an explanation was in order. The disbursements on the Lavergne Property, again, were just as bizarre with no funds going to Gambino and $120,000 to Enzo, with loan fees over $7,000, and an unexplained disbursement to Harris Bank for $10,000.

The Koonce defendant's argument to the trial court was that Gambino was the one who committed the fraud based on the fact that he may have shown the trustee's deeds from North Star to Sal. The trial court found that this "prove[d] nothing except that by having in his possession such a deed *** Gambino provided [Sal, Enzo] and Koonce with the tools of their fraud."

There was no credible evidence at trial to prove that Gambino authorized and/or ratified the contested transactions. The Koonce defendants argue that Gambino received hundreds of thousands of dollars from the disputed transactions in cash, checks, and the

47

payment of bills and loans. They point out that Gambino told Thomas Gambino that he had authorized Sal and Enzo to procure a loan on one of his properties. Further, they point out that overdue real estate taxes were paid on the subject properties from the closings. Further, they argue that Gambino's response to the Zippershtein foreclosure action showed that Gambino ratified the transactions. They argue that Gambino, after being served with the foreclosure complaint, never filed a motion to dismiss or strike the foreclosure action, but simply allowed the mortgage to be paid.

First, the only testimony that Gambino actually received hundreds of thousands of dollars from the disputed transactions was the testimony of Sal and Enzo, which the trial court found to be not credible. Koonce testified that he signed numerous checks payable to Sal and Enzo for what he believed were loans to Gambino. Yet, Koonce, a lawyer and sophisticated real estate investor, never discussed the matter with Gambino or obtained any receipts of the moneys he paid to Sal or Enzo for Gambino. Multiple payments were made to third parties from the closings, including creditors of Sal. Deposits of large amounts of moneys were made into Enzo's bank accounts and the bank account of his girlfriend, which Enzo testified was converted to cash and given to Gambino, but no documentary evidence showed that Gambino actually received these moneys.

Second, the fact that Gambino approached Sal about procuring a loan on one of the subject properties was admitted by plaintiffs in their complaint at the outset; what was contested was the transactions that conveyed the subject properties from Gambino to several defendants for pennies on the dollar. Further, the fact that overdue real estate taxes were paid from the closings does not prove that Gambino ratified the transactions or that the taxes were paid for his benefit. Rather, the evidence at trial shows that the

48

overdue real estate taxes were paid for the benefit of several of the defendants in the case to clear title to the properties. Finally, the events surrounding the Zippershtein foreclosure action does not undercut the trial court's finding that Gambino did not ratify the contested transactions. Upon receiving a letter demanding payment of the Zippershtien mortgage, Gambino denied any knowledge with regard to the loan. When suit was filed, he appeared to defend until that suit was voluntarily dismissed by Zippershtein. These arguments cannot serve as a basis for reversing the trial court's findings.

We now address the arguments of Plaza Bank. Plaza Bank's arguments on appeal solely concern the trial court's order voiding its mortgage lien on the Niles Property. Plaza Bank argues that the trial court's findings with regard to plaintiffs' claim to quiet title to the Niles Property were against the manifest weight of the evidence. *Smith, Allen, Mendenhall, Emons & Selby v. Thomson Corp.*, 371 Ill. App. 3d 556, 558 (2006) (trial court's decision following a bench trial is reviewed to determine if the judgment is against the manifest weight of the evidence). Plaza Bank argues that the evidence presented coupled with plaintiffs' judicial admissions establishes that Gambino was aware of and participated in the Niles mortgage.

Plaza Bank first argues that Sal and Enzo were Gambino's agents. In this regard, Plaza Bank argues that Gambino engaged Sal and Enzo to procure a loan on one of his properties, authorized Sal to obtain his credit report, and authorized Pritikin to speak with Sal regarding the procurement of a loan to settle his liability with the IRS. The trial court found in its November 30, 2007, order that "there was no proof of any statement or conduct by Gambino that encouraged or led these defendants or anyone else to produce

49

these forged and falsely notarized documents purportedly transferring title, to [his] detriment." The judgment of the trial court cannot be reversed on this basis.

Plaza Bank then argues that Gambino ratified the Niles transaction. As noted, ratification occurs when the principal learns of an unauthorized transaction, then retains the benefits of the transaction or takes a position inconsistent with nonaffirmation. *Stathis*, 295 Ill. App. 3d at 858, citing *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 310 (1992).

Plaza Bank points to the fact that Gambino directed North Star to convey legal title to the Niles Property to him 10 days before the Zippershtein mortgage was procured on the property. Plaza Bank argues that Gambino received moneys from the first closing related to the Niles Property and also points out that Gambino told Thomas Gambino that he had authorized Sal and Enzo to procure a loan on one of his properties. Further, Plaza Bank points out that overdue real estate taxes were paid on the subject properties from the closings. Further, Plaza Bank argues that Gambino's response to the Zippershtein foreclosure action showed that Gambino ratified the transactions. Plaza Bank argues that Gambino, after being served with the foreclosure complaint, never filed a motion to dismiss or strike the foreclosure action, but simply allowed the mortgage to be paid.

Again, the fact that Gambino approached Sal about the possibility of procuring a loan on one of the subject properties was admitted by plaintiffs in their complaint at the outset; what was contested was the transactions that conveyed the subject properties from Gambino to several defendants by the use of fraudulent, forged legal documents including forged deeds. Further, the fact that overdue real estate taxes were paid from the closings does not prove that Gambino ratified the transactions or that the taxes were

50

paid for his benefit. Rather, the evidence at trial shows that the overdue real estate taxes were paid for the benefit of several of the defendants who needed to have clear title. Finally, the events surrounding the Zippershtein foreclosure action does not undercut the trial court's finding that Gambino did not ratify the contested transactions. Upon receiving a letter demanding payment of the Zippershtien mortgage, Gambino denied any knowledge of the loan. When suit was filed, he hired a lawyer to defend until that suit was voluntarily dismissed. Like the Koonce defendants' arguments, Plaza Bank's arguments are not persuasive.

Plaza Bank also argues that Gambino is judicially estopped from denying the Niles transaction, because of his involvement in the Zippershtein foreclosure suit. The doctrine of judicial estoppel postulates that " 'a party who assumes a particular position in a legal proceeding is estopped from assuming a contrary position in a subsequent legal proceeding.' " *Barack Ferrazzano Kirschbaum Perlman & Nagelberg v. Loffredi*, 342 Ill. App. 3d 453, 460 (2003), quoting *Bidani v. Lewis*, 285 Ill. App. 3d 545, 550 (1996). The purpose of the doctrine is " 'to promote the truth and to protect the integrity of the court system by preventing litigants from deliberately shifting positions to suit the exigencies of the moment.' " *Loffredi*, 342 Ill. App. 3d at 460, quoting *Bidani*, 285 Ill. App. 3d at 550. The five elements necessary for the application of judicial estoppel include the following: " 'the party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial proceedings, (4) intended for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it.' " *Loffredi*, 342 Ill. App. 3d at 460, quoting *People v. Caballero*, 206 Ill. 2d 65, 80 (2002).

51

In the case at bar, the elements of judicial estoppel have not been met. Gambino did not take a position in the case at bar factually inconsistent with his position in the Zippershtein foreclosure action. In both actions, he contested the validity of the Zippershtein mortage. When the foreclosure action was filed, Gambino retained a lawyer to defend the case. It was Zippershtein who voluntarily dismissed that suit.

Plaza Bank then argues that Gambino had unclean hands. It is a basic maxim of equity that he who seeks equity must do equity. *Long v. Kemper Life Insurance Co.*, 196 Ill. App. 3d 216, 218 (1990). The doctrine of "unclean hands" precludes a party from taking advantage of his own wrong. *Long*, 196 Ill. App. 3d at 219, citing *State Bank of Geneva v. Sorenson*, 167 Ill. App. 3d 674, 680 (1988). It is an equitable doctrine that bars relief when the party seeking that relief is guilty of misconduct in connection with the subject matter of the litigation. *Thomson Learning, Inc. v. Olympia Properties, LLC*, 365 Ill. App. 3d 621, 634 (2006), citing *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 221-22 (2001). For the doctrine to apply, the party's misconduct must rise to the level of fraud or bad faith. *Thomson Learning, Inc.*, 365 Ill. App. 3d at 634, citing *Beitner v. Marzahl*, 354 Ill. App. 3d 142, 150 (2004). To determine whether a party acted with unclean hands, the court must look to the intent of that party. *Thomson Learning, Inc.*, 365 Ill. App. 3d at 634, citing *Schivarelli v. Chicago Transit Authority*, 355 Ill. App. 3d 93, 103 (2005). The doctrine is unavailable where the act giving rise to the defense does not directly involve the transaction which is the subject of the litigation. *Cole v. Guy*, 183 Ill. App. 3d 768, 776 (1989). The application of the doctrine is a matter for the trial court's discretion, which this court will not disturb on

appeal absent an abuse of that discretion.  *Long*, 196 Ill. App. 3d at 219, citing *Fair Automotive Repair, Inc. v. Car-X Service Systems, Inc.*, 128 Ill. App. 3d 763, 768 (1984).

Plaza Bank argues that Gambino lied in plaintiffs' verified complaint when he verified the allegation that he never directed North Star to convey legal title to the subject properties to anyone including himself.  Further, Plaza Bank argues that Gambino made misrepresentations to the IRS on the values of the subject properties.  Plaza Bank's argument cannot be used to reverse the trial court's judgment as the actions giving rise to its "unclean hands" argument did not involve the Niles transaction.  Further, since Gambino returned the title documents to North Star, the trial court may have found that allegation drawn by his attorney did not rise to the level of "unclean hands," and we cannot say that the trial court abused its discretion in its findings on that matter or on Gambino's representation to the IRS.  The trial court did not abuse its discretion by not applying the "unclean hands" doctrine.

Finally, Plaza Bank argues that the trial court awarded Gambino a "windfall" when it ordered Plaza Bank's mortgage lien on the Niles Property void.  They claim they are entitled to a lien on the Niles Property in the amount of $335,000, for its payoff of the Zippershtein mortgage, $54,000 for their payment of back real estate taxes paid on the Niles Property, and $69,000 which Plaza Bank claim Gambino received from the Niles transactions.

Compensatory damages are those which are awarded to a person as compensation, indemnity or restitution for a wrong or injury sustained by him.  *Harris v. Peters*, 274 Ill. App. 3d 206, 207 (1995).  The purpose of awarding compensatory damages is to make the injured party whole and restore him to the position he was in

before the loss, but not to enable him to make a profit or windfall on the transaction. *Harris*, 274 Ill. App. 3d at 207, citing *Rittenhouse v. Tabor Grain Co.*, 203 Ill. App. 3d 639, 650 (1990).

Plaza Bank's argument is not persuasive because it never raised the issue of restitution or its entitlement to a lien on the Niles Property in any pleading. The issues in controversy and the theories upon which recovery is sought are fixed by the pleadings. *IMC Global v. Continental Insurance Co.*, 378 Ill. App. 3d 797, 804 (2007), citing *Kincaid v. Ames Department Stores, Inc.,* 283 Ill. App. 3d 555, 568 (1996). Accordingly, the trial court lacked jurisdiction to adjudicate an issue not presented through proper pleadings. *William J. Templeman Co. v. Liberty Mutual Insurance Co.,* 316 Ill. App. 3d 379, 388 (2000). Since Plaza Bank never raised the issue of restitution or its entitlement to a lien on the Niles Property in a pleading, we cannot say that the trial court abused its discretion in denying the relief requested.

Based on the foregoing, we affirm the trial court's findings with respect to plaintiffs' claims to quiet title to the subject properties.

## 2. Slander of Title

We now consider the trial court's findings concerning plaintiffs' slander of title counts. As noted, plaintiffs alleged slander of title in counts II, IV, and VI of their complaint. Count II was pled against Sal, Enzo, and the Koonce defendants with regard to the Lavergne Property. Counts IV and VI were pled against Sal, Enzo, the Koonce defendants, and the Wolf defendants with regard to the Niles and Kedzie Properties, respectively. On November 30, 2007, the trial court found in favor of plaintiffs on those counts.

54

The Koonce defendants and the Wolf defendants (Wolf and WW Funding) argue that the trial court's findings as to plaintiffs' slander of title counts are against the manifest weight of the evidence. A plaintiff asserting slander of title bears the burden of proving the following: (1) the defendants made a false and malicious publication, either oral or written; (2) that such publication disparaged the plaintiff's title to property; and (3) damages due to such publication. *Chicago Title & Trust Co. v. Levine*, 333 Ill. App. 3d 420, 424 (2002), citing *American National Bank & Trust Co. v. Bentley Builders, Inc.*, 308 Ill. App. 3d 246, 251 (1999). A plaintiff must also prove that the defendants acted with malice. *Levine*, 333 Ill. App. 3d at 424, citing *Bentley Builders*, 308 Ill. App. 3d at 252. To prove malice, the plaintiff must show that the defendants knew that the disparaging statements were false or that the statements were made with reckless disregard of their truth or falsity. *Levine*, 333 Ill. App. 3d at 424, citing *Bentley Builders*, 308 Ill. App. 3d at 251-52. A defendant acts with reckless disregard if he publishes the allegedly damaging matter despite a high degree of awareness of its probable falsity or if he has serious doubts as to its truth. *Levine*, 333 Ill. App. 3d at 424, citing *Bentley Builders*, 308 Ill. App. 3d at 252.

The act of maliciously recording a document that clouds another's title to real estate is actionable as slander of title. *Bentley Builders*, 308 Ill. App. 3d at 252, citing *Whildin v. Kovacs*, 82 Ill. App. 3d 1015, 1016 (1980). However, if the party who records the document has reasonable grounds to believe that he has title or a claim to the property, he has not acted with malice. *Bentley Builders*, 308 Ill. App. 3d at 252, citing *Whildin*, 82 Ill. App. 3d at 1016. Malice is a question of fact. *Bentley Builders*, 308 Ill. App. 3d at 252, *Whildin*, 82 Ill. App. 3d at 1016. In a bench trial, it is the function of the

55

trial judge to weigh the evidence and make findings of fact. *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433 (1991). A trial court's findings of fact are entitled to great deference and should not be overturned on review merely because the reviewing court may have reached a different result. *Lake County Grading Co. Of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.,* 275 Ill. App. 3d 452, 463-64 (1995). A trial court's findings of fact will only be set aside when they are against the manifest weight of the evidence. *In re Application of the County Treasurer,* 131 Ill. 2d 541, 549 (1989). A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Case v. Forloine,* 266 Ill. App. 3d 120, 125 (1993).

The Koonce defendants first argue that plaintiffs failed to prove the element of publication. *Emery v. Northeast Illinois Regional Commuter R.R. Corp.*, 377 Ill. app. 3d 1013, 1022 (2007) (in order to prove publication, a plaintiff must show that allegedly slanderous remarks were communicated to someone other than plaintiff). The Koonce defendants' argument ignores the trial court's finding that the Koonce defendants participated in the acts leading to the recording of all the legal documents which slandered plaintiffs' title to the subject properties. Plaintiffs were not required to prove that the Koonce defendants actually recorded the documents. All persons who cause or participate in the publication of slanderous matters are responsible for such publication. *Van Horne v. Muller*, 185 Ill. 2d 299, 308 (1998). At trial, Sal admitted that he personally recorded all the deeds, including the forged trustee's deed conveying title to the Lavergne Property from North Star directly to Koonce. Further, mortgage liens were recorded against the Lavergne Property due to loans applied for by Koonce as borrower. Further, Koonce submitted his application for a loan on the Lavergne Property in April

2003 through Boulevard, which received an $850 fee for "loan application and processing fees." Further, Title America was the title company used for five of the six closings which led to the recording of the legal documents slandering plaintiffs' title to all three of the subject properties. The element of publication against the Koonce defendants was proven.

The Koonce defendants and the Wolf defendants both argue that there was no evidence that they acted with malice. We will address the trial court's findings with regard to the Koonce defendants first.

The trial court found that Koonce was personally involved with Sal in defrauding Gambino from the outset of the events leading to this trial. At trial, Sal admitted that he recorded all the deeds as to the subject properties. As to the Lavergne Property, he admitted that he recorded the forged trustee's deed conveying title from North Star directly to Koonce. As to the Niles Property, the trial court believed the testimony of Fritzshall, Zippershtein's attorney, that Koonce claimed he was Gambino's attorney. At trial, Koonce denied that he ever represented to anyone that he was Gambino's attorney but the trial court found his testimony not credible.

The trial court noted that Koonce "refinanced" the Lavergne Property, although he did not own it. He submitted a loan application as a "refinance" and signed it as the "borrower." Further, the court noted Koonce's agreement with WW Funding to take an option to purchase the Kedzie Property, an option for which Koonce admitted he paid nothing.

Further, the trial court found that both Boulevard and Title America acted with malice. With respect to Boulevard, the court found that Koonce and Sal used Boulevard

57

in various ways for these transactions. Koonce used a Boulevard form to submit an application for a $800,000 loan to Washington Mutual on the Niles and Kedzie Properties. Koonce and Sal used Boulevard to obtain a credit report for Gambino, and issued a mortgage loan commitment for Gambino from it. Koonce quitclaimed his interest in the Lavergne Property to Boulevard.

The trial court noted that Title America, of which Koonce is the sole shareholder, was used as the title company for five of the six contested transactions. The trial court found that the reason for this was so scrutiny of the forged documents would remain low. Title America accepted the forged deeds and other forged documents. Moneys were paid from the closings to third parties unrelated to the transactions. Large checks and wire transfers were issued by Title America to Enzo and Sal, and to creditors of Sal.

Based on the foregoing, we cannot say that the trial court's findings that the Koonce defendants acted with malice was against the manifest weight of the evidence.

We now address the Wolf defendants argument that the trial court's findings that they acted with malice was against the manifest weight of the evidence.

The Wolf defendants argue that they did not know nor should they have known that the warranty deed WW Funding received from "Joseph J. Gambino" to the Niles Property was forged or that the warrantee deed from "Joseph J. Gambino" to Century for the Kedzie Property, title to which WW Funding later obtained, was forged. The Wolf defendants argue that they, in good faith, believed that they were purchasing the Niles and Kedzie Properties by paying off the Zippershtein mortgage and the Century loan.

The trial court found that Wolf was involved with Sal's defrauding of Gambino from the beginning of the events leading to trial. Sal first approached Wolf with regard

58

to the Niles Property. Wolf referred the loan to Zippershtein, who made a $200,000 loan on the Niles Property. Wolf earned a $5,250 commitment fee from that loan. His son Adam earned a $4,000 commitment fee. Both Fritzshall and Sal testified that Wolf was present for the first closing related to the Niles Property. Wolf denied being present.

With regard to the Kedzie Property, Wolf referred the loan to Azran who made a loan through his company Century. Century loaned $200,000, taking title to the property as security for the loan, and purportedly leased the property back to Gambino; a purchase option which lapsed in a year's time was also purportedly given to Gambino. Azran testified that it was agreed in advance that in the event Gambino did not exercise his option to purchase, Wolf, Zippershtein, and Azran would each take a one-third ownership interest in the property. Wolf was paid a $6,250 commitment fee for this loan. His son Adam was also paid a $6,250 loan fee for this loan. When Gambino failed to exercise the option to purchase the Kedzie Property, it was Wolf who purchased the property through his company WW Funding. From this closing, WW Funding was paid a $25,000 commitment fee. As to the Niles Property, after Zippershtein filed the foreclosure suit, WW Funding purchased the property, obtaining $445,000 in financing from Plaza Bank. WW Funding held $135,171.38 from closing. Upon WW Funding's taking title to both the Niles and Kedzie Properties, options to purchase were granted to Koonce.

The trial court "flatly disbelieve[d]" Wolf's testimony that he personally met with Gambino and that Gambino approved the aforementioned transactions.

As to WW Funding, the trial court found that Wolf used WW Funding to complete the transactions in which he would finally hold title to the Niles and Kedzie Properties.

59

Based upon the foregoing, we cannot say that the trial court's finding as to the Wolf defendants' malice was against the manifest weight of the evidence. We recognize the fact that large commitment fees are sometimes earned in "hard-money" transactions like the ones in the case at bar and that large commitment fees are not necessarily indicative of illegal transactions. However, it was the trial court's duty to determine whether the Wolf defendants had acted with malice in the case at bar, which it did, and based upon the record before us we cannot determine that the opposite conclusion, that the Wolf defendants did not act with malice in slandering plaintiffs' title to the Kedzie and Niles Properties, was clearly evident.

Accordingly, the trial court's findings with respect to plaintiffs' slander of title claims are affirmed.

### 3. Damages

The Koonce defendants and the Wolf defendants raise several arguments with regard to the trial court's award of compensatory and punitive damages. They argue that the trial court abused its discretion in awarding attorney fees in the amount of three times the lodestar. They further argue that the trial court's award of punitive damages was error as a matter of law, against the manifest weight of the evidence, an abuse of discretion, and in violation of their constitutional right to due process.

We begin with the arguments with regard to the trial court's award of attorney fees. As noted, the trial court awarded attorney fees to plaintiffs in the form of compensatory damages: $595,574 on counts IV and VI of plaintiffs' complaint, such damages imposed jointly and severally against Sal, Enzo, and the Koonce defendants; $556,485 on counts IV and VI of plaintiffs' complaint, such damages imposed jointly

and severally against Wolf and WW Funding, and $595,574 on count II of plaintiffs' complaint, imposed jointly and severally against Sal, Enzo, and the Koonce defendants. The court found that plaintiffs were to have only one recovery of compensatory damages, and the judgments entered were not cumulative.

A trial court has broad discretionary powers in awarding attorney fees and its discretion will not be reversed on review unless the court abused its discretion. *Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 485 (1999), citing *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991). The party seeking fees bears the burden of presenting sufficient evidence from which the trial court can render a decision as to their reasonableness. *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 983 (1987), citing *Fiorito v. Jones*, 72 Ill. 2d 73 (1978); *Heckman v. Hospital Service Corp.*, 104 Ill. App. 3d 728 (1982); *Ealy v. Peddy*, 138 Ill. App. 3d 397 (1985). An appropriate fee consists of reasonable charges for reasonable services; however, to justify a fee, more must be presented than a mere compilation of hours multiplied by a fixed hourly rate or bills issued to the client (*In re Marriage of Angiuli*, 134 Ill. App. 3d 417 (1985)), since this type of data, without more, does not provide the court with sufficient information as to their reasonableness -- a matter which cannot be determined on the basis of conjecture or on the opinion or conclusions of the attorney seeking the fees. *Flynn v. Kucharski*, 59 Ill. 2d 61 (1974); *In re Marriage of Angiuli*, 134 Ill. App. 3d 417 (1985). Rather, the petition for fees must specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor. *Fiorito*, 72 Ill. 2d 73; *Ealy v. Peddy*, 138 Ill. App. 3d 397 (1985). Because of the importance of these factors, it is incumbent upon the petitioner to present detailed records maintained during the course of

61

the litigation containing facts and computations upon which the charges are predicated. *Flynn v. Kucharski*, 59 Ill. 2d 61 (1974); *Board of Education of the Aptakisic-Tripp School District No. 102 v. County of Lake*, 156 Ill. App. 3d 1064 (1987).

Once presented with these facts, the trial court should consider a variety of additional factors such as the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client (*Ashby v. Price*, 112 Ill. App. 3d 114 (1983)), and whether there is a reasonable connection between the fees and the amount involved in the litigation. *In re Estate of Healy*, 137 Ill. App. 3d 406 (1985); *In re Marriage of Ransom*, 102 Ill. App. 3d 38 (1981).

As noted, on March 31, 2006, Gambino engaged attorneys Michael Braun, Sherwin Winer, and Kevin O'Rouke, after his original attorneys had withdrawn. Initially, all three attorneys billed monthly on an hourly rate. Within a short time, Gambino was unable to keep current in paying the attorneys' fees. Counsels were unwilling to continue working on an hourly basis when their bills were not being pay and they would not agree to deferring payment until conclusion of the case. It was agreed that while billing would continue on an hourly basis, all amounts unpaid would be treated by a contingency fee agreement. Specifically, all unpaid hourly fees would be paid at three times the amount billed if and when the case reached successful outcome. Costs were to be treated in the same manner. The attorneys' billings were attached to the fees petition submitted to the trial court after trial. A total of $187,196 in bills was unpaid, and thus subject to the contingency enhancement.

62

The trial court found that the attorneys' hourly rates were reasonable and all itemizations sufficiently detailed, noting its own familiarity with the entire context of the trial court proceedings. The trial court found the time billed for each item appropriate, recognizing the difficulties presented by the multidefendant, multiproperty case and the expertise of plaintiffs' counsel.

The Wolf defendants argue that the trial court abused its discretion by awarding attorney fees for plaintiffs' slander of title claims. They argue that only the attorney fees incurred on plaintiffs' quieting title claims were recoverable, not fees incurred for plaintiffs' claims for slander of title. This argument is not persuasive.

Contrary to the Wolf defendants' argument, there is authority in Illinois providing that recovery for slander of title actions permit recovery of those costs and attorney fees which directly flow from the wrongful disparagement. *Home Investments Fund v. Robertson*, 10 Ill. App. 3d 840, 844 (1973). Further, plaintiffs were entitled to recover those costs and attorney fees directly related to the quieting of title and to those damages directly related to a slander of title, *i.e.*, loss of vendibility, etc. *Robertson*, 10 Ill. App. 3d at 844.

Both the Koonce defendants and the Wolf defendants argue that the trial court abused its discretion by awarding attorney fees enhanced by a multiplier of three. They argue that no Illinois authority supported the use of a multiplier.

The trial court rejected defendants' objections to the use of a multiplier of three times the lodestar, finding that the measure was imminently reasonable. The trial court found the hourly rates were modest and the attorneys' itemized time appropriate.

63

Further, the trial court found that the fee was proportionate to the value of the properties at issue, roughly $2.5 million.

As noted, plaintiffs were entitled to recover those costs and attorney fees directly related to the quieting of title and to those damages directly related to a slander of title, *i.e.*, loss of vendibility, etc. *Robertson*, 10 Ill. App. 3d at 844. Plaintiffs costs and attorney fees directly related to the quieting of title and to those damages directly related to a slander of title were those costs which Gambino agreed to in his contingency agreement with counsel who tried this litigation to successful outcome.

The Koonce defendants and the Wolf defendants do not cite, and our independent research does not reveal any Illinois authority that forbids the award of plaintiffs' actual costs and attorney fees directly related to this action. No law of this state, including any statute, compels us to find the contingency agreement against public policy.

We cannot find that the trial court abused its discretion by awarding plaintiffs attorney fees actually incurred in this action.

We now turn to the arguments regarding the imposition of punitive damages. As noted, the trial court awarded $675,000 in punitive damages: $500,000, jointly and severally, against Sal, Enzo, and the Koonce defendants, and $175,000 against Wolf and WW Funding.

The purpose of punitive damages is: " '(1) to act as retribution against the defendant; (2) to deter the defendant from committing similar wrongs in the future; and (3) to deter others from similar conduct.' " *Gomez v. The Finishing Co.*, 369 Ill. App. 3d 711, 721 (2006), quoting *Hazelwood v. Illinois Central Gulf R.R.,* 114 Ill. App. 3d 703, 712 (1983). Such damages will be awarded only where the defendant's conduct is willful

64

or outrageous due to evil motive or a reckless indifference to the rights of others. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1137 (2004), citing *Proctor v. Davis*, 291 Ill. App. 3d 265, 285 (1997). Because punitive damages are not favored in the law they are only available in cases where the wrongful act complained of is characterized by wantonness, malice, oppression, willfulness, or other circumstances of aggravation. *Franz*, 352 Ill. App. 3d at 1138.

On appeal from a bench trial, the question of whether punitive damages are available as a matter of law for the cause of action is reviewed *de novo*. *Franz*, 352 Ill. App. 3d at 1137. The question of whether the facts prove willfulness or other aggravating factors is a factual determination that is reviewed using the manifest-weight standard. *Franz*, 352 Ill. App. 3d at 1137-38. Whether punitive damages should be awarded is reviewed for an abuse of discretion. *Franz*, 352 Ill. App. 3d at 1138. We review the computation of the punitive damages award to determine whether the amount was excessive or the result of passion, partiality, or corruption. *Franz*, 352 Ill. App. 3d at 1138.

"In reviewing [the] determination of the amount of punitive damages, if any, we will reverse only if the award was 'so excessive [as] to indicate passion, partiality, or corruption.' " *Gomez*, 369 Ill. App. 3d at 722, quoting *Franz*, 352 Ill. App. 3d at 1138. The assessment of punitive damages is a highly factual decision, which is appropriately made at the trial court level. *Franz*, 352 Ill. App. 3d at 1144. The amount of an award should be a reflection of the fact finder's determination as to the degree of maliciousness evidenced by a defendant's actions. *Franz*, 352 Ill. App. 3d at 1144. In reviewing the maliciousness of conduct for purposes of punitive damages awards, a reviewing court is

65

not in a position to reassess the credibility of the witnesses who testified at trial. *Franz*, 352 Ill. App. 3d at 1144. A trial court must evaluate available evidence of a defendant's financial worth in calculating punitive damages, but an award will not be overturned just because the defendant did not present evidence of financial worth at trial. *Gomez*, 369 Ill. App. 3d at 722, citing *Franz*, 352 Ill. App. 3d at 1144, and *Kochan v. Owens-Corning Fiberglass Corp.*, 242 Ill. App. 3d 781, 798 (1993).

Here, as a matter of law, punitive damages are available. See *Chicago Title & Trust Co. v. Levine*, 333 Ill. App. 3d 420, 426 (2002) (affirming award of punitive damages in slander of title case).

However, the Koonce defendants and the Wolf defendants argue that the trial court erred by imposing punitive damages, as a matter of law, because there was no evidence to support a finding of malice beyond that necessary for a finding of liability on the tort of slander of title itself. They argue that, "to the extent that plaintiff[s] established nothing more than the elements of the tort itself, punitive damages are not appropriate." Further, they argue that the trial court's finding that punitive damages were warranted in this case was against the manifest weight of the evidence. These arguments are unpersuasive.

In Illinois, although malice is an element of the tort of slander, punitive damages may be awarded in slander cases where actual malice exists. *Levine*, 333 Ill. App. 3d at 426; *Mullen v. Solber*, 271 Ill. App. 3d 442, 445 (1995). Further, as is apparent from a reading of the trial court's memorandum opinions and orders, it found actual malice warranting the imposition of punitive damages in this case. The trial court found that the malice exhibited by these defendants was beyond that necessary to establish the elements

of plaintiffs' slander of title claims. The trial court found that the Koonce defendants and the Wolf defendants participated in a number of transactions by which the subject properties were taken from plaintiffs by means of fraudulent, forged legal documents. Again, we note that the settlement documents are direct evidence of fraud. The Niles Property alone had $25,000 in commitment fees distributed to the Wolfs and Zippershtein; a mortgage escrow of $33,000, which is unusual; a $5,000 appraisal fee; and a payment to Sal of $25,000 that is questionable on its face. The Kedzie settlement disbursements reveal commitment or loan fees of $18,750, a $25,000 payment to "Norman Trust Account," and $5,372.72 to a law firm not involved in the process, and over $50,000 to unknown people and only $10,000 to Gambino. The disbursements on the Lavergne Property were just as bizarre with no funds going to Gambino and $120,000 to Enzo with loan fees over $7,000 and an unexplained disbursement to Harris Bank for $10,000. Further, Wolf, Zippershtein, and Azran, had in place an agreement to share in the ownership of the Kedzie Property in the event Gambino should fail to exercise his option to purchase the property. The trial court's decision to impose punitive damages in this case was neither error as a matter of law, against the manifest weight of the evidence, or an abuse of its discretion. Again, the assessment of punitive damages is highly factual decision that should be a reflection of the fact finder's determination of maliciousness. *Gomez*, 369 Ill. App. 3d at 722. We cannot disturb the trial court's assessment of punitive damages here.

We note that no defendant has provided us with any authority of whether the trial court's assessment of punitive damages before its calculation of compensatory damages was error. As a result any contention in this regard is waived. 210 Ill. 2d R. 341(h)(7).

67

We also were unable to find any authority dictating the reversal of the trial court's order under these circumstances. We also note that the fact that no evidence of defendants' financial status does not require reversal. *Kochan*, 242 Ill. App. 3d at 798. This court in a decision authored by Justice Cahill recently upheld an award of punitive damages despite the absence of evidence of the defendant's financial status in *Gomez v. The Finishing Co.*, 369 Ill. App. 3d 711 (2006).

Next, both the Koonce defendants and the Wolf defendants argue that the trial court's award of punitive damages violated their constitutional right to due process.

The standard of review for the constitutional question of whether a punitive damages award is excessive in violation of due process is reviewed *de novo*. *Franz*, 352 Ill. App. 3d at 1147. A constitutional challenge to an award of punitive damages is separate from the common-law challenge addressed above. *Franz*, 352 Ill. App. 3d at 1147. The constitutional question requires a court to consider three factors: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *Franz*, 352 Ill. App. 3d at 1147, citing *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 440, 149 L. Ed. 2d 674, 689, 121 S. Ct. 1678, 1687 (2001).

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North Amerca, Inc. v. Gore*, 517 U.S. 559, 575, 134 L. Ed. 2d 809, 826, 116 S. Ct. 1589, 1599 (1996). Courts are instructed to consider the following factors when determining

reprehensibility: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Gore*, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1599. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. at 408, 419, 155 L. Ed. 2d 585, 602, 123 S. Ct. 1513, 1521 (2003).

In the case at bar, the evidence presented and highlighted by the trial court's findings, demonstrated the reprehensible nature of the defendants' conduct. As noted, the factors to be considered in determining reprehensibility include whether the target of the conduct was financially vulnerable, whether the conduct involved repeated actions and whether the harm was the result of intentional malice, trickery, or deceit. Here, it is undisputed that Gambino was in serious financial debt in the summer of 2002. He owed back taxes to the IRS and overdue real estate taxes. Further, the conduct involved repeated actions. Over 40 legal documents were used in order to take title to the subject properties over the course of six real estate closings. The trial court also found that the

69

harm here was the result of intentional malice, trickery, and deceit. The trial court determined that the Koonce defendants and the Wolf defendants participated in a scheme to take plaintiffs' properties through the use of fraudulent, forged legal documents including forged deeds.

Furthermore, the punitive damages awarded in this case were only a fraction of the damages plaintiffs' suffered as a result of the defendants' conduct. The trial court's imposition of punitive damages in this case did not violate due process.

### 4. Sanctions

We finally come to the final issues on appeal; whether the trial court abused its discretion by denying two Illinois Supreme Court Rule 137 motions for sanctions (155 Ill. 2d R. 137) in its May 2, 2008, order. Plaintiffs filed a cross-appeal from the denial of their motion for sanctions against defendants Plaza Bank and Washington Mutual for failing to amend their answer to plaintiffs' complaint to conform to the proofs of this case. Plaza Bank and Washington Mutual filed their own Rule 137 motion in response to plaintiffs' motion, which was also denied. Plaza Bank and Washington Mutual appeal the denial of their motion for sanctions.

As noted, plaintiffs' complaint alleged that Plaza Bank and Washington Mutual knew or should have known that the trustee's deeds recorded against the subject properties were forged. In response to this allegation both Plaza Bank and Washington Mutual answered that they "lacked knowledge or information sufficient" to form a belief as to the truth of the allegation.

Plaintiffs filed a motion for sanctions against Plaza Bank and Washington Mutual on December 12, 2007, after the trial court's November 30, 2007, order, arguing that

Plaza Bank and Washington Mutual had a continuing duty to monitor the accuracy of their answer and that their continued disavowal of the forgeries warranted sanctions.

Plaza Bank and Washington Mutual responded and filed a cross-motion for sanctions, contending that the motion for sanctions filed by plaintiffs themselves was not well-grounded in fact or law.

Illinois Supreme Court Rule 137 allows the trial court to award sanctions against parties who filed frivolous pleadings when a pleading has no basis in fact or law. 134 Ill. 2d R. 137. An attorney's signature on a pleading, motion or other paper indicates:

> "That to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose."

134 Ill. 2d R. 137.

"Rule 137 is intended to prevent counsel from making assertions of fact or law without support." *Lewy v. Koeckritz International, Inc.*, 211 Ill. App. 3d 330, 334 (1991). Specifically, with respect to a question of law, Rule 137 is intended to provide a sanction when a party asserts a proposition of law which is *contrary* to established precedent. *Shea, Rogal & Associates, Ltd. v. Leslie Volkswagen, Inc.*, 250 Ill. App. 3d 149 (1993).

In order to avoid sanctions, parties must present objectively reasonable arguments for their view, regardless of whether they are found to be correct. *Shea*, 250 Ill. App. 3d at 154. In determining whether sanctions are warranted in a particular case, the court must ascertain what was reasonable at the time, and should not engage in hindsight. *Lewy*, 211 Ill. App. 3d at 334. The determination of whether to impose sanctions under

71

Rule 137 rests with the sound discretion of the trial court; the decision to impose or deny sanctions is entitled to great weight on appeal and will not be disturbed on review absent an abuse of discretion. *In re Estate of Wernick*, 127 Ill. 2d 61, 77-78 (1989).

The trial court did not abuse its discretion by denying plaintiffs' motion for sanctions. It is quite settled that a pleading is judged at the time that it is filed. *Ambrose v. Thornton Township School Trustees*, 274 Ill. App. 3d 676, 685 (1995) ("[i]n determining whether sanctions are warranted in a particular case, the court must ascertain what was reasonable at the time, and should not engage in hindsight"). Further, there was evidence in the record that if believed would have validated Plaza Bank and Washington Mutual's answer. Evidence was presented to the trial court that Gambino ratified and/or authorized the transactions; of course, this evidence was rejected by the trial court, but it cannot be used as a basis to sanction a party on the basis of a pleading filed long before the trial court's judgment.

Further, the trial court did not abuse its discretion by denying Plaza Bank and Washington Mutual's motion for sanctions. Although the trial court made no specific findings as to the denial of this motion for sanctions, the trial court could have found that plaintiffs' motion for sanctions was not made for an improper purpose and was a good-faith argument for the extension, modification, or reversal of existing law to impose a duty on litigants a continuing duty to amend their pleadings as facts come to light that would prove their pleadings mistaken.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County in its entirety.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.